Levi Y. Silver, SBN 273862
**SILVER & SILVER APC**
600 West Broadway, Suite 1520
San Diego, CA 92101
Tel:  (619) 231-1600
Fax: (619) 231-1616
Email: lsilver@silverlawfirm.com
www.silverlawfirm.com

Daniel M. Carlson, SBN 169314
**CARLSON LAW FIRM, A.P.C.**
600 West Broadway, Suite 1550
San Diego, CA 92101
Tel:  (619) 544-9300
Fax:  (619) 234-0043
Email:  dcarlson@carlsonlawfirm.com
www.carlsonlawfirm.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EUGENE C. BRUNNER, an individual; and MARY T. BRUNNER, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> TOTAL WEALTH MANAGEMENT, INC., a California corporation; ALTUS CAPITAL MANAGEMENT, LLC, a Delaware limited liability company; ALTUS CAPITAL OPPORTUNITY FUND LP, a Delaware limited partnership; JACOB K. COOPER; PRIVATE PLACEMENT CAPITAL NOTES II, LLC, a Colorado limited liability company; TONY M. HARTMAN; AEGIS RETAIL GROUP, LLC, a Delaware limited liability company; AEGIS HOLDING COMPANY, LLC, a California limited liability company; TERRENCE GOGGIN; and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No. **'13CV3080 JLS  BLM** <br><br> **COMPLAINT FOR VIOLATIONS OF AND RESCISSION UNDER THE FEDERAL AND STATE SECURITIES LAWS, UNFAIR COMPETITION, CONSTRUCTIVE FRAUD, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, COMMON COUNTS, AND ACCOUNTING** <br><br> **DEMAND FOR JURY TRIAL** |

Eugene C. Brunner ("Eugene") and Mary T. Brunner ("Mary"; collectively, "Plaintiffs"), for their Complaint against Defendants Total Wealth Management, Inc.

("Total Wealth"), Altus Capital Management, LLC ("Altus Capital"), Altus Capital Opportunity Fund LP ("Altus Fund"), Jacob K. Cooper ("Cooper"), Private Placement Capital Notes II, LLC ("PPCN"), Tony M. Hartman ("Hartman"); Aegis Retail Group, LLC ("Aegis Retail"), and Aegis Holding Company, LLC ("Aegis Holding"; collectively with Aegis Retail, the "Aegis Defendants"), Terrence Goggin ("Goggin"), and DOES 1 through 100, inclusive (collectively, "Defendants") allege, upon personal knowledge with respect to themselves and their own acts and upon information and belief with respect to all other matters, as follows:

## PARTIES

1.      Plaintiffs, husband and wife, are individuals living in the State of California, in the County of San Diego. Eugene C. Brunner is the beneficiary of the Eugene Brunner IRA account, while Mary T. Brunner is the beneficiary of the Mary T. Brunner IRA account.

2.      Defendant Total Wealth is a corporation organized under the laws of the State of California, having its principal place of business at 8880 Rio San Diego Dr., Suite 350, San Diego, California 92108. Total Wealth is an investment adviser registered with the Securities and Exchange Commission ("SEC") (IARD No. 140503).

3.      Defendant Cooper is a citizen and resident of the State of California. At all relevant times, Cooper was Total Wealth's Chief Executive Officer and "Owner" and acted within the course and scope of such authority. Cooper holds himself out as a Certified Financial Planner, a Certified Wealth Preservation Planner and a Certified Asset Protection Planner.

4.      Defendant Altus Capital is a limited liability company organized under the laws of the State of Delaware, having its principal place of business at 8880 Rio San Diego Dr., Suite 350, San Diego, California 92108. Altus Capital is not qualified to do business in the State of California. At all relevant times, Total Wealth was Altus Capital's managing member and acted within the course and scope of such authority. Moreover,

Total Wealth and Altus Capital represented to potential investors that they were identical for legal reasons, and thus, are referred to collectively as "Total Wealth Defendants."

5.      Defendant Altus Fund is a limited partnership organized under the laws of the State of Delaware, having its principal place of business at 8880 Rio San Diego Dr., Suite 350, San Diego, California 92108. At all relevant times, Cooper, Total Wealth, and Altus Capital acted as the investment advisers and general partners to the Altus Fund. The Total Wealth Defendants and Cooper all acted within the course and scope of their respective authority over Altus Fund. Altus Fund is also Plaintiffs' nominee for the investments it purchased through the limited partnership.  Plaintiffs have invested approximately $300,000, which represents a substantial part of their life savings, in Altus Fund through their IRA and joint accounts.

6.      Defendant PPCN is a limited liability company duly organized under the laws of the State of Delaware.

7.      Defendant Hartman is a citizen and resident of Colorado. At all relevant times, Hartman was PPCN's managing member and acted within the course and scope of such authority.

8.      Defendant Aegis Retail is a limited liability company duly organized under the laws of the State of Delaware, having its principal place of business at 2001 Addison Street, Suite 275, Berkeley, California 94705.

9.      Defendant Aegis Holding is a limited liability company duly organized under the laws of the State of California, having its principal place of business at 2001 Addison Street, Suite 275, Berkeley, California 94705. At all relevant times, Aegis Holding was Aegis Retail's managing member and acted within the course and scope of such authority.

10.     Defendant Goggin is a citizen and resident of the State of California. At all relevant times, Goggin was Aegis Holding's Chief Executive Officer and acted within the course and scope of such authority.

11.     Defendants DOES 1 through 100, inclusive, are sued herein under fictitious names, their true names and capacities being unknown to Plaintiffs.  Plaintiffs will ask leave of Court to amend this Complaint by inserting their true names and capacities in the place and stead of said fictitious names when the same have been ascertained.  Each defendant designated herein as DOES 1 through 100, inclusive, is responsible in some way and/or manner for the acts and occurrences herein alleged, whether such acts and occurrences were committed intentionally, negligently, recklessly or otherwise, and each DOE defendant is liable to Plaintiffs for the damages suffered by Plaintiffs.

## OVERVIEW OF THE ACTION

12.     This is a suit by Plaintiffs to recover more than $300,000 from defendants based on a number of federal and state securities law violations.

13.     Defendants defrauded Plaintiffs and deprived them of certain monies by engaging in a fraudulent and deceptive scheme designed to distribute securities to the public while evading federal and state regulatory oversight and avoiding meaningful disclosure of material information to potential investors, including Plaintiffs.

14.     Plaintiffs are unsophisticated investors. Their combined net worth, exclusive of primary residence, is less than $650,000, while their joint gross income for the past three years has not exceeded $60,000 per year.

15.     Cooper and the Total Wealth Defendants formed an investment advisory relationship with Plaintiffs to develop and manage suitable investment portfolios on Plaintiffs' behalf.

16.     Purporting to recommend a portfolio of investments, Cooper and Total Wealth sold Plaintiffs certain limited partnership interests in Altus Fund, a "pooled investment vehicle" or "private fund" managed by the Total Wealth Defendants and Cooper.

17.     Rather than undivided interests in the limited partnership as a whole, Plaintiffs' Altus Fund interests corresponded to certain securities, which were purchased

and held by Altus Fund "for the benefit of" ("FBO") Plaintiffs. The FBO securities, including the PPCN notes and Aegis Retail debentures (the "Aegis Notes"), were recommended and offered to Plaintiffs by Cooper and Total Wealth on the basis of certain purported suitability criteria and personalized investment advice. Defendants PPCN and Aegis Retail did not establish any substantial relationship with Plaintiffs prior to their purchase of the Altus Fund interests. Nor did any of the defendants make any meaningful, material disclosures to Plaintiffs concerning Altus Fund, PPCN, or Aegis Retail prior to their purchase of the Altus Fund interests.

18.     Defendants' overarching course of dealing consists of various contrivances, transactions, and misrepresentations designed to indirectly effect and accomplish an unlawful public offering and distribution of securities. As more fully discussed below, each of the defendants' independent acts and conduct underlying this course of dealing is itself a violation of applicable federal and state securities and investment management laws, including:

        a.     Offering for sale and selling unregistered securities to the public;

        b.     Offering for sale and selling unregistered investment company securities to the public;

        c.     Employing a pyramiding scheme to avoid registration as an investment company with the Securities and Exchange Commission;

        d.     Misrepresenting the nature of defendants' relationships with Plaintiffs;

        e.     Misrepresenting the nature of defendants' investment services;

        f.     Employing misleading and deceptive advertising to effectuate purchases of securities and investment services;

        g.     Failing to disclose or misrepresenting material information concerning the various securities and their suitability for investors, including, among other things, the investments' risk and illiquidity, and other applicable terms and conditions;

h.     Failing to disclose serious conflicts of interest arising out of defendants' relationships with Plaintiffs and each other;

i.     Misrepresenting the fees, commissions, and profits earned by defendants in connection with the sale of securities and the provision of investment services;

j.     Misrepresenting a defendant's strategic relationships to induce prospective investors' purchase of the issuer's shares; and

k.     Breaching fiduciary duties owed Plaintiffs by failing to account for monies invested with Altus Fund.

19.     Additionally, Aegis Retail has materially breached the terms of the Aegis Notes by, among other things:  (i) failing to make principle and interest payments when due; (ii) failing to make disclosures required under the Aegis Notes and their related documents; and (iii) shifting Plaintiffs' money to Goggin, Aegis Holding and other companies and individuals sued herein as DOE defendants, which are alter egos of Aegis Retail.  As a result, each of the Aegis Defendants is jointly and severally liable for Aegis Retail's obligations under the Aegis Notes.

## GENERAL ALLEGATIONS

### The Defendants' Registration Status with Pertinent Regulators

20.     At all relevant times, the Total Wealth Defendants were not registered broker-dealers with the SEC or with California state regulators.

21.     Persons who effect securities transactions for the accounts of others for compensation, who advertise that they engage in the business of buying and selling securities or providing investment advice in regard to securities, are required to register with such regulators as broker-dealers.

22.     The Altus Fund limited partnership interests, the Aegis Notes, and the PPCN promissory notes are all "securities" within the meaning of Section 2(a)(1) of the

Securities Act, 15 U.S.C. § 77b(a)(1). At all relevant times, the Altus Fund, Aegis Retail, and PPCN securities were not registered with the SEC.

23.     The Altus Fund, Aegis Retail, and PPCN securities were first sold to the public on December 8, 2009, August 1, 2010, and January 5, 2009, respectively. In offering and selling their respective securities, Altus Fund, Aegis Retail, and PPCN relied on the "private offering" exemption from registration under Section 4(2) of the Securities Act, 15 U.S.C. § 77d(2), and Rules 502 and 506 of SEC Regulation D, 17 C.F.R. §§ 230.502 and 230.506.

24.     Altus Fund and PPCN are engaged primarily in the business of investing, reinvesting, or trading in securities, and are therefore "investment companies" within the meaning of Section 3(a)(1)(A) of the Investment Company Act, 15 U.S.C. § 80a-3(a)(1)(A).

25.     Under Section 8 of the Investment Company Act, 15 U.S.C. § 80a-8, all investment companies must register with the SEC.

26.     At all relevant times, neither Altus Fund nor PPCN was registered with the SEC. Instead, they relied on the "private investment company" exemption found in Section 3(c)(1) of the Investment Company Act, 15 U.S.C. § 80a-3(c)(1), which exempts from registration any investment company issuer whose outstanding securities are beneficially owned by not more than one hundred persons and which is not making and does not presently propose to make a public offering of its securities.

27.     Issuers who engage in general advertising and solicitation to the public cannot rely on these exemptions to registration.

### The Defendants' General Advertising and Solicitation Practices

28.     Cooper hosted a weekly radio show called "Minding Your Own Business" ("MYOB") on AM 600 KOGO ("KOGO") a 5,000 watt AM news/talk radio station.

29.     Each MYOB episode is 39 to 47 minutes long. Episodes cover different topics, including personal finance, interviews with other investment managers, and

commentary on current financial news and events. The MYOB episodes are a vehicle to generate sales leads for Cooper, Total Wealth, and Altus Fund, as well as the securities offered through Total Wealth, such as Aegis Retail and PPCN. Listeners are invited to contact Total Wealth via the telephone number or by visiting its webpage to receive investment services and products and "educational incentives" such as free books, customized retirement plans, and investment surveys and newsletters.

30.     MYOB has a very large audience. KOGO boasts a daily broadcast audience of a quarter of a million adults, age twenty-five and older, and nearly 237 million monthly nationwide listeners over the internet. MYOB is also retransmitted through Apple Inc.'s online media service, iTunes Store, which, according to Apple Inc., had 160 million users in 23 countries in 2010. At least 68 episodes are also available on Total Wealth's website for downloading. Plaintiffs are informed, and thereon allege, that MYOB has been transmitted through these media outlets since at least July 2009.

31.     MYOB programs constitute general advertising of investment services and securities and solicitation of purchasers for the same.

32.     For example, in an October 9, 2010 MYOB episode entitled "Are You Allocated or Diversified?" Cooper discussed Total Wealth's customized investment advisory services with reference to model client portfolios.

33.     According to Cooper, Total Wealth offers its clients better investment products and services than other investment professionals. Other advisers focus primarily on traditional investments, such as publicly traded stocks and bonds, that are subject to price fluctuations and market risk. Unlike those advisers, Total Wealth offers its clients a mix of traditional and alternative investments spread apart several "asset classes."

34.     As an example of an "asset class" product available through Total Wealth, Cooper again discussed "collateralized note or capital note funds," which he conceded was "one of my favorite [asset classes] because of its simplicity and safety behind the investment." Such an investment is collateralized, i.e., "backed by something tangible"

like real estate. Unlike stocks and bonds, the collateral helps to protect the investment's principal in a downturn.

35.     Cooper discussed the return on investment for such products:

> Now, what about the return? So you have some safety -- additional safety there from market volatility.    Now,    what about the return? The return is very predictable usually in a capital or collateralized note fund. It's usually a fixed return of say 10 to 12 1/2%, something in that range. These are private investments remember, so thank goodness for that, because they aren't subject to market forces such as bonds are. Collateralized notes are a fixed income solution. You can take that 9, 10, 12 1/2%, whatever the fund is paying as a fixed return, have it reinvested or take it as income. So therefore this asset class is a debt offering, similar to bonds, and can be a suitable substitute for bonds in your portfolio with, I believe, much less volatility and higher returns historically.

36.     Assuming an investor is looking for long-term returns of 8-12%, Cooper told his listeners that a "Collateralized Note Fund or Capital Note Fund" is a good overall piece to a well-constructed portfolio because it can "provide reasonable fixed rates of return that are consistent with what you're hoping to get over the long term anyway, but on a fixed basis, backed by collateral and little if any volatility." Although Total Wealth promotes "capital note funds" as a component of a well-constructed portfolio, Cooper explained that he would advise against investors placing all of their money in such investments because of business risk, i.e., risk of "loss associated with a business failing."

37.     In the October 9, 2010 broadcast, Cooper also shared with his audience certain model "customized portfolios" based on Total Wealth's investment strategies, explaining that the models are "examples that are meant to show the power of what we do in our private client management."

38.     Cooper represented that Total Wealth's asset allocation strategies perform better during periods of market turbulence than traditional diversification strategies:

> Now historically the results I'm going to share with you as I give you an example portfolio here are representative of actual results had we entered into this or that model and held the model over the time span being discussed. They are so much more superior than historical traditional investments during that same time [frame].

9

39.     According to Cooper, the average annual return from January 2006 through October 2010 on Total Wealth "moderate" and "moderate aggressive" portfolio examples was 14.37% and 18.01%, respectively.

40.     Cooper then discussed the models' composition. The "moderate" and "moderate aggressive" portfolio examples composed of the same "asset class" components, namely "capital note funds," "first trust deed funds," "senior bond debentures," "global income," "precious metals," "equities," "managed futures," "global macro," and "Forex currency trading."

41.     Cooper clarified that each portfolio's risk profile and performance was not based on the underlying investments, but rather, the relative allocation of funds to each "asset class":

> I did a moderate portfolio, let's do a moderate aggressive. Now you could make this more conservative or more aggressive just by changing the weightings of each asset class.    In fact you're going to see that the moderate example I just went through last segment and this moderate aggressive model have the exact same asset classes and invest – and investment approaches, the exact same. What's different is how much each gets, the allocation is what makes it more or less conservative or aggressive.

42.     Cooper concluded the October 9, 2010 broadcast by telling his audience that Total Wealth's portfolio construction "is the value, it is the answer, it is how our clients have had no down years in the past four or five years."

43.     Cooper interviewed Hartman in a June 20, 2010, MYOB episode called "MSS: Capital Note Programs with Tony Hartman." MSS stands for "Manager Spotlight Series," a series of MYOB episodes in which Cooper interviews managers of private equity funds that are also Altus Fund investments.

44.     Cooper told his audience that he had chosen to interview Hartman "because he runs a fund that specializes in the capital note strategies or collateralized notes" which Cooper represents to be one of his "favorite" investments.

45.   Although Cooper and Hartman purported to discuss "collateralized notes and capital notes" in a generic sense, Cooper and Hartman were, in fact, advertising and soliciting offers to buy PPCN, by stressing particular attributes of the PPCN investment, including, but not limited to:

**PPCN's business model:**

> MR. COOPER: [W]hat do you do or what does a capital note fund do with the money? How do you make money with the investor money?
>
> HARTMAN: Maybe there's a developer or an investor out there that needs some money. . . and let's say they need to borrow 20 million dollars to get a to get a development going or a rehab project going or to finish some real estate project. . . . So oftentimes investors or developers will look to a source like a capital notes program for interim or short-term financing to get them over that hurdle, if you will. Now, so when they approach us, the first thing we're asking them if they're looking to borrow money is what do you have for collateral and if that collateral—after we do appraisals and we get independent broker price opinions, if it's not at least 200% collateral, we're probably going to pass on that transaction and go to the next one.

**The PPCN investment's suitability, objectives and risk:**

> COOPER: Okay. So we have a fixed or a semi-fixed yield in the low double digits backed by collateral so it's really meant to be a fixed income alternative but without all that volatility that can be present with bonds.
>
> HARTMAN: That's right.

**The expected return on investment and investment time horizon for a PPCN investment:**

> COOPER: So as we look at a typical example here, if someone comes into the fund, you know, they might invest money into a collateralized note or a capital note fund and they might get something like a low double digit fixed yield for, you know, a three or a five or some kind of time period, is that about right?
>
> HARTMAN: That's right. That's right.

**The payment and reinvestment options for a PPCN investment:**

> HARTMAN: [A] capital note strategy is a fund that employs those kinds of strategies and are [sic] typically going to include notes that potentially earn something like interest rates back to investors in the low double digit returns annually over a several year period. That interest, they could choose to have that credited monthly, quarterly, semi-annually, they could even

have that interest compounded back in and reinvested so their account balance actually is growing each month, too.

**The collateral for PPCN's bridge loans:**

HARTMAN: [O]ne of the most powerful features of these collateral backed notes programs that I think is probably the most significant part of them is that these notes are typically backed by a pool of hard assets most of the time, in our situation all the time, but there are other funds out there that use other assets, but in our case, they're backed by first trust deeds on real estate. And what that does it helps secure the principle. It improves the safety dramatically, the fact that we have typically a first position deed or mortgage, depending on which state we're in.

**The terms for PPCN's bridge loans:**

COOPER: Okay. So let's assume that someone says, okay, yes, I do – I come to a capital note fund, I'm a developer. I do have 200% collateral. I'm asking to borrow a million but I've got two million to pledge. What are typically the loan terms that might be in place?

HARTMAN: Probably—I would say probably 60% to 80% of the time, the terms are going to be something on the order of— the loan interest rate is going to be 14% to 16% and typically 5 to 10 points—they call them loan origination points.

COOPER: And that's why you can pay your investors such an attractive low double digit yield on a very consistent basis. . .

**PPCN's underwriting standards and their competitive advantage:**

COOPER: Yeah, another way to say it for very much layman's terms, we're saying 200% collateral backs the investor's money. You know, in other words, you as a lender, as a private lender, or any capital note fund as a private lender will only lend up to 50% in first position of the collateral being pledged or the property being pledged. And I just think, my goodness, if banks loaned with that strict criteria, you know, we might be in a lot less—they might be in a lot different situation, a better situation than they are today.

HARTMAN: That's right. In fact, we probably—had most of the banks been following that kind of guidance, we probably would not have had much of the subprime induced fallout.

**A PPCN success story:**

HARTMAN: Well, let me step you through one here that we did last year and give a little background here on how a capital note strategy worked here. Here's a property. This is in Deer Valley, Utah. A major ski resort, park, city [sic]. There were a number of luxury townhomes that were right on the mountain. These

were ski-in, ski-out places. A builder built these townhomes, got them almost all the way done -- the only thing that he had left to do was to finish some crown molding on it, some trim and some interior paint. The builder at that point had 6 million dollars of borrowed money into these townhomes. Well, the builder ran out of money, couldn't get refinanced.

A long story short, the bank ended up -- the lender -- or the builder's bank ended up taking those properties back. Enter to the picture our borrower. Our borrower comes in, approaches the bank that took back those townhomes and ended up buying them from the bank for 1.8 million bucks. Now, we're talking about six— and all the money that the builder originally put in the deal actually improved the value of the collateral so the collateral was higher than the 6 million dollars at the original time.

So we lent this—our borrower 1.8 million dollars to purchase these foreclosed townhomes from the bank and also about $300,000.00 that allowed him to finish the properties, the paint, and carpet and trim, et cetera. That borrower turned around after he finished those properties, he sold about half of those properties and paid back the fund in full.

COOPER: And all the interest due and everything like that.

HARTMAN: And that particular transaction was around -- if my memory is correct, around a 15% interest rate plus about 6 percentage points. Now, typically, the loan origination point that we get on those goes to cover the costs of our due diligence and appraisals and closing costs and legal and title and all that.

COOPER: Yeah, keeping things -- keeping things right and safe hopefully, and above board.

HARTMAN: Yeah, so very powerful transaction and those townhomes got put back into the economy and purchased and along the way, very profitable.

**<u>Security and safety of an investment in PPCN:</u>**

HARTMAN: Depending on which particular program that they've chosen, and many investors probably choose to actually have their earnings reinvested back in so they're growing and compounding their account and their value's going forward. But in our case and the strategy that we like to employ, the ones that we favor, the collateralized notes programs typically for a dollar of capital that goes in, it's going to be backed by two dollars of hard assets. And, most of the time, with our programs, those hard assets are going to be real estate backed. They're not backed by a piece of paper. A lot of bond assets, for example, not only do they fluctuate up and down with the volatility of Wall Street, but also many of them are not secured by anything. They aren't backed by any major assets.

COOPER: Yeah, which is the advantage of a collateralized note program in that they are backed by hard assets. There is something there. If you think about a stock portfolio, you'd ask the question, okay, over a five- to ten-year time horizon, what would you expect -- and I ask this to investors all the time -- what do you think is a reasonable rate of return through all the ups and downs of a mutual fund or stock or equity portfolio? And I get the answer all the time, you know, 8% to 12% would be reasonable. And I agree with that, I think that's reasonable, but here is a solution or an opportunity with a collateralized note program -- and, again, this may or may not be suitable for everyone. It's important for everyone to understand there's risk in anything and to review it with competent advisors. But in a capital note program, you can get a low double digit yield that's fixed and backed by collateral whereas stock and mutual fund portfolios boast no such safety or systems in place if something does go wrong.

HARTMAN: Right. That's right. And the main thing our-- the collateral, typically I like to think of that as an equity cushion.

**PPCN's risk management strategies, including strategies for borrower defaults:**

COOPER: [I]f someone borrowed a million dollars for a short-term bridge loan financing or something like that from the capital note fund or other private lending source, and they pledge two million of collateral, if something goes wrong, you can take that two million in collateral and sell it, say, for just a million-and-a-half at a fire sale, that's $500,000.00 of profit, and guess what, the fund and the investors therefore profit from that excess as well, correct?

HARTMAN: That's right. That's right. So it's a win-win all the way around. The only person that would lose in a scenario like that would be the borrower if they defaulted. . .

**PPCN's distribution and availability through Total Wealth:**

COOPER: [I]n 2008, what did those programs do? Well, they did low double digit yields.      You know, in 2000 through '02, what did they do?  Low double digit yields despite the Stock Market having a lot of problems in those example years. And, you know, people always go, well, how in the world can they continue to do that when the Stock Market is going down? What's the answer? It's not stocks. It doesn't matter. It has no correlation to do with the Stock Market in general which is why these programs continue to be very predictable and consistent earners for a lot of investors out there.

Tony, I want to thank you so much for your time today on "Minding Your Own Business."

HARTMAN: Well, thank you, Jacob. I am honored to have been part of it.

COOPER: Awesome, man, thank you.

And what we're doing right now is if you'd like to call and set an appointment to learn more about these things or other opportunities that might assist you in your financial planning, give us a call and set an appointment. 619-704-1500. 619-704-1500. If you are one of the first nine, we'll give you a great book called "How an Economy Grows and Why It Crashes" by Peter and Andrew Schiff. 619-704-1500. You're on KOGO. We'll be right back.

46.    Cooper thereafter endorsed PPCN as an investment product and strategy:

COOPER: I feel it is very important to choose investments that offer predictable yields and I'm not saying low yields. You don't have to always have a 3 or 4 kind of percent yield if you want predictability and a good amount of safety.  The  collateralized note programs for suitable investors offer many times low double digit yields with a lot of collateral for security of the principle investment.

47.    Later in the same broadcast on June 20, 2010, Cooper advertised a model investment portfolio of the kind offered by Total Wealth, which was constructed from "many different asset classes, including stocks and bonds and collateralized notes, what we've just been over . . . , and let me tell you just a brief bit of how this portfolio reacts historically and what it might have done."    Cooper explained that from January 2006 through May 2010, his model portfolio's average annual return was 19.34%, and, upon closer inspection,

We find no negative quarters. None. Yet, we—in this time period of January 2006 forward. Now, that's amazing. Stop and think about that. There are no negative quarters but the Stock Market has had six negative quarters during the same time.    It's worst month—how about this, it's worst month—this model's worst month is negative .55%. The market's worst month is negative 16.94%.

48.    Unlike Altus Fund and PPCN, Aegis Retail utilized the internet as a medium in which to engage in general advertising and solicitation. On October 31, 2009, sales agents for Aegis Retail posted the following advertisement on a website called www.go4funding.com, "an online platform that brings together entrepreneurs, investors, and business experts from around the world":

Metropolitan Coffee & Concession and its manager, Aegis Retail Group, LLC/Aegis Holding Company LLC, has the

15

exclusive agreement and sole licensing with Peet's Coffee & Tea to set up stores along with a Fresh Market/Sprig (similar to Bristol Farms) in high traffic business and trans-terminal locations all over the Greater San Francisco Bay Area, as well as in New York, and eventually nationwide. This is one investment I know will do very well.

. . .

New York operations would be opening at the following locations: Lipstick Building (annual riders 20,523,760), Goldman Sachs (annual riders 32,082,960), 200 Park Avenue South in Union Square NY (annual riders 33,744,169), Harlem Gardens in Upper Manhattan NY, 10 Exchange Place in Wall Street West NJ, and Commissary NJ. These are just a few of the locations to mention. After these, they will expand nationwide targeting all high traffic trans-terminal and business locations.

While [Metropolitan Coffee & Concession] is in need of $15-20M private equity funding and whether [Metropolitan Coffee & Concession] gives up equity of an interest return on investment, [Metropolitan Coffee & Concession] has the VP of Operations directly from Peet's and will retain control of management and business growth to ensure that the consumer's "coffee experience" will reflect the authenticity of Peet's Coffee & Tea.

49.     On December 15, 2009, the Pennsylvania Securities Commission ("PSC") issued a cease-and-desist order against Aegis Retail, Aegis Holding, and nonparties Jason Vinet and Vinet Capital Corporation (collectively, "Vinet"). According to PSC, Aegis Retail and Aegis Holding solicited the purchase of unregistered Aegis Retail debentures from Pennsylvania residents through Vinet and the www.go4funding.com advertisement, who posted an advertisement entitled "National Brand Company seeks $20M in Equity Funding for Expansion" on an internet message board. The advertisement explained that Aegis Retail sought funding to set up tea and coffee stores in the San Francisco and New York areas and contained a link to the website for an affiliate of Aegis Retail. On information and belief, Vinet is an unregistered broker-dealer operating out of Danville, California.

50.     A resident of Pennsylvania responded to the advertisement seeking additional information. This person was not an accredited investor within the meaning of Rule 501 of Regulation D, 17 C.F.R. § 230.502, and did not have a preexisting relationship with

Vinet. Vinet contacted the resident, transmitting the Aegis Retail's security's offering documents over electronic mail and then contacting the resident over the telephone. Based on this conduct, the PSC ordered Aegis Retail, Aegis Holding and Vinet to cease and desist from further soliciting or selling in Pennsylvania.

### Plaintiffs Learn of Cooper and Total Wealth through the MYOB Broadcasts

51.     Plaintiffs learned of Cooper and Total Wealth from Cooper's MYOB radio broadcasts. Based on what they heard in those broadcasts, Plaintiffs contacted Cooper to arrange a meeting to discuss his approach to investing.

52.     During the ensuing meetings, Plaintiffs told Cooper that they had a combined net worth of not more than approximately $750,000, had a modest income, and described their investment objective as steady growth and their risk tolerance as "moderate." Plaintiffs further informed Cooper the funds they were planning to invest through him represented a substantial part of their retirement savings in IRA accounts.

53.     At these meetings, Total Wealth, through Cooper's presentation, made the following representations to Plaintiffs:

        a.     It was as an investment adviser subject to a fiduciary standard of care;

        b.     Its recommendations to Plaintiffs were a function of five variables: (1) the investment time horizon; (2) risk tolerance; (3) the expected return on investment; (4) any asset class preference expressed by Plaintiffs, and (5) Plaintiffs' tax status;

        c.     Its recommendations were consistent with Plaintiffs' moderate risk tolerance and stated objective of steady growth;

        d.     Total Wealth employed rigorous "due diligence screens" for determining what investments they would recommend, including, whether the issuers or investment managers were subject to regulatory oversight;

        e.     There was as much or more oversight of PPCN as on Wall Street because outside auditors reviewed their financial statements;

f.     Plaintiffs would make their investments through the Altus Fund, an "investment portal" that gave them superior flexibility and control;

g.     Total Wealth's only form of compensation was a management fee of one percent (1%) for managing Plaintiffs' investments, and Total Wealth did not receive any commissions or share revenue or fees from the underlying investments;

h.     PPCN was in the business of providing real estate developers with short- term bridge loan financing, for which it obtained first trust deeds as collateral, and its promissory notes were backed by such collateral;

i.     The Aegis Retail debentures to be purchased by Total Wealth for Plaintiffs' account would be secured by specific personal property under a collateral security agreement and a corresponding financing statement would be filed with the Secretary of State of California;

j.     Aegis Retail was a franchisee of Peet's Coffee & Tea, Inc. ("Peet's) in the San Francisco area and had recently secured exclusive rights to the Peet's franchise in New York City.  Aegis Retail was issuing its debentures, which the Total Wealth Defendants sometimes referred to as the "Peet's Bonds," to finance its expansion into the New York City market;

k.     Some of the underlying investments had lock-up periods where their investment could not be withdrawn, but because of a gentlemen's agreement between Cooper and the underlying investment managers, there would be no problem withdrawing Plaintiffs' funds, if necessary; and

l.     PPCN and Aegis Retail were subject to regulatory oversight.

54.   Based on what Plaintiffs heard in the MYOB radio shows, the written advertising materials presented by Cooper and their meetings, and Cooper's oral representations, Plaintiffs decided to hire Cooper and Total Wealth as their investment advisors.

55.     Cooper consented to have Total Wealth be the investment advisor for Plaintiffs. Cooper's acceptance established a fiduciary relationship between Plaintiffs and Total Wealth and Cooper.

**Plaintiffs Enter into a Relationship with Total Wealth and Altus Fund**

56.     In or about September 2009, Cooper provided Plaintiffs with certain documents they were purportedly required to sign in order to establish their relationship with Total Wealth. The documents provided had stickers where they were to sign and there were no instructions other than the prior representations made by Cooper during earlier meetings. Plaintiffs signed the documents on behalf of the respective IRA accounts under the belief they were executing documentation necessary to open their account with Total Wealth. At the time they signed these documents, Plaintiffs relied on the representations of their investment advisor, Cooper, that these documents were routine forms necessary for Plaintiffs to open their account with Total Wealth. Plaintiffs did not sign any other documentation with Altus Fund or the Total Wealth Defendants.

57.     Beginning in or about March 2010, Total Wealth exercised discretion and through Altus Fund invested Plaintiffs' funds in PPCN notes, Aegis Retail debentures and other unregistered securities.

58.     Total Wealth invested in the following securities, among others, on behalf of Plaintiff:

| Account | Issuer | Face Amount | Value on 7/31/2013 Statement | Maturity |
|---|---|---|---|---|
| Eugene / Mary | Aegis Retail | $471.06 | $667.17 | 3/14/2014 |
| Mary IRA | PPCN | $29,300.00 | $36,442.24 | 10/14/2015 |
| Mary IRA | Aegis Retail | $2,679.10 | $3,793.75 | 3/14/2014 |
| Eugene IRA | Aegis Retail | $50,000.00 | $79,808.35 | 3/28/2013 |
| Eugene IRA | PPCN | $87,500.00 | $112,684.62 | 3/28/2015 |

COMPLAINT AND JURY DEMAND

59.    Neither Cooper nor Total Wealth ever referred to, described, or presented to Plaintiffs the Altus Fund Private Placement Memorandum or Limited Partnership Agreement or any such documentation for the other unregistered securities purchased for their benefit through Altus Fund.

60.    On information and belief, neither PPCN nor Aegis Retail provided meaningful financial statements to Altus Fund before Altus Fund invested in securities issued by those entities.

61.    The Aegis Retail Subscription Agreement contains the following provision:

> [Aegis Retail] has previously delivered to Purchaser, or will on request deliver to Purchaser, a memorandum of the Offering containing, among other things, a description of the activities proposed to be conducted by the Company, and a statement of its financial projections. The materials and statements contained in that memorandum are, in the opinion of the Company's Manager and officers, true, accurate, soundly based, and reasonable.

62.    The Aegis Retail PPM was never disclosed to Plaintiffs by Cooper, the Total Wealth Defendants or Aegis Retail.

### Aegis Retail's Relationship With Peet's

63.    On June 1, 2011, Peet's Coffee filed a Form 8-K with the SEC detailing a lawsuit brought against it by Aegis Retail and Aegis Holding. The Form 8-K disclosed the following:

> On May 17, 2011, Aegis Retail Group, LLC and various affiliates filed a lawsuit against us claiming that we breached an alleged agreement to permit Aegis to open licensed Peet's Coffee & Tea locations and participate in our We Proudly Brew program in the New York metropolitan area. We believe the lawsuit to be entirely without merit and plan to vigorously defend Peet's good name.

> Peet's has a contract with Aegis dating back to 2007 that only allows Aegis to open and operate up to eight Peet's licensed kiosks at Bay Area Rapid Transit (BART) stations in the San Francisco Bay Area. Aegis currently operates three licensed Peet's kiosks and one We Proudly Brew location in BART stations.   We also supply one Aegis-owned restaurant in the Lipstick Building in New York City with Peet's coffee as part of our We Proudly Brew program. We have no other agreement or business with Aegis. Aegis is a very small customer of Peet's.

> Since 2007, and more recently over the last 18 months, it has come to our attention that Aegis was making misleading statements about its relationship with Peet's in fundraising efforts, suggesting that it has rights to open Peet's licensed stores in the northeastern U.S. when no such rights or agreement exist. On numerous occasions, we warned Aegis not to misrepresent its relationship with Peet's.

64.    The Aegis Retail PPM is an exhibit in the court file in <u>Aegis Retail Group, LLC, et al. v. Peet's Coffee & Tea, Inc. et al.</u>, Case No. 651330-11 (N.Y. Sup. Ct.). The Aegis Retail PPM discloses, among other things:

    a.    The Aegis Retail investment involves a high degree of business and financial risk;

    b.    The debenture's suitability for a particular investor "will depend upon, among other things, the purchaser's ability to accept highly speculative risks";

    c.    An investor in Aegis Retail must be "financially able to bear the economic risk of an investment . . . including the total loss thereof";

    d.    The Aegis Retail debentures are illiquid and not publicly-traded;

    e.    Aegis Retail's business is owning, managing, and operating retail centers serving Peet's Coffee beverages and other prepared and unprepared food and grocery items;

    f.    Aegis Retail has entered into a "letter of intent for a Supply and License Agreement" with Peet's Coffee for use in some, but not all, of its retail centers;

    g.    Aegis Retail intended to use the Peet's Coffee brand as the anchor for its retail centers, and the failure to accomplish such an affiliation would have adverse financial consequences for Aegis Retail and its members;

    h.    Many of the Aegis Retail stores had not yet been built. Aegis Retail was in the process of acquiring approvals and permits from the cites of New York and Jersey City, and delays in the permitting process or the construction process would have adverse consequences on Aegis Retail;

i.     The maximum amount to be raised by the offering was $15 million. Of that, Aegis Holding had budgeted $13.5 million for the total cost of construction of the retail centers, LLC formation, offering and syndications costs, and initial operating costs. The remaining $1.5 million was earmarked as compensation to Aegis Holding.

65.     Attached to the affidavit of Peter Kiem, Peet's Coffee's General Manager for Food Service & Licensing, filed in the New York lawsuit, was a March 4, 2010 email from Kiem to Mike Lukin, then-President of Aegis Retail, in which he explained:

a.     Affiliates of Aegis Retail had been promoting the Aegis Retail securities by saying, "We are in the beginning of a $15M raise for expansion of the Peet's Coffee and Tea brand in New York and based on what we are experiencing at BART, New York City is going to do very well."

b.     Kiem asked that Aegis Retail discontinue using Peet's Coffee in connection with its fundraising, and observed that,

> Currently, we have no licensed opportunities under review with [Aegis] in the New York market so we are concerned about any misrepresentations your potential investors may have about Peet's level of involvement in your projects, current or future. Our existing contract is only for the 8 units at BART, and while we are certainly willing to evaluate quality opportunities with any of our operating partners, we can offer no guarantees of approvals, exclusivity, etc.

> Going forward, if you wish to use the Peet 's name in your fund raising solicitations please review with me first so as to avoid any potential misrepresentation of Peet' s involvement.

66.     Also attached to the Keim affidavit was a copy of Lukin's response, wherein he acknowledged that Aegis Retail agreed with Peet's understanding of their relationship.

67.     However, Aegis Retail and Aegis Holding and the Total Wealth Defendants continued to make the following representations to its placement agents and potential investors:

a.     Aegis Holding is the only "Master Licensee" of Peet's Coffee in the United States;

b.     Aegis Holding and its affiliates, including Aegis Retail, have exclusive rights to the Peet's Coffee brand in New York City;

c.     Aegis Retail's restaurants and grocery stores would be "anchored" by a "Peet's Coffee café"; and

d.     Aegis Retail's expansion plans in New York City had already been approved by Peet's Coffee.

68.    For example, in an email dated April 15, 2010—one month after the above-mentioned email exchange between Peet's and Aegis Retail—Cooper represented the following to Plaintiffs:

> Aegis Retail Group is a master licensee of Peet's Coffee. There are only a few in the country, and not easy to obtain. It's similar to a franchise, but actually more exclusive. The debentures/bonds are not backed by the publicly traded Peet's (you know that), but by the stores and assets of that particular development. But the operation is fully approved and endorsed by the publicly traded Peet's. In fact the COO of Aegis, Joel Sjostrom, was the COO of the publicly traded Peet's and left that post with Peet's board's endorsement to manage Aegis. They also own the concession at the Bay Point Bart Station, and will have the other 4 stations fully up and running within 36 months.

69.    These representations were false when made.  As explained in the Kiem Affidavit:

> Despite a well-defined operating relationship, Aegis has taken great liberties with the unauthorized use of the Peet's name, relationship and confidential information for its own purposes. It has engaged in a pattern of repeated mis-use of the Peet's name and misrepresentation and distortion of its relationship with Feet's, trading inaccurately on the Peet's name for its own benefit, and exaggerating and misstating its relationship with Peet's in an effort to improperly exploit the association with Peet's and to raise money from unwitting investors. All this, despite repeated warnings from Peet's over time (and multiple times within the past year alone) to refrain from doing so.

> On five separate occasions - beginning in 2007 and culminating with false and misleading representations about Peet's earlier this year - it came to our attention that Aegis was mischaracterizing and exploiting its relationship with Peet's. On each of these occasions, when confronted with the misrepresentations, Aegis apologized, insisted that it strove to accurately describe its relationship with Peet's, and promised that the wrongs we complained about would not occur again.

But when we most recently confronted Aegis in March 2011, we learned about even more.

In September 2007, Metropolitan gave itself the "d.b.a." of "PEET'S AT BART" in a fundraising effort, a blatant misappropriation of the Peet's name, which Peet's protested. Nonetheless, in early 2010, Aegis again misleadingly invoked the Peet's relationship in a fundraising effort. We protested, telling Aegis that it should clear any use of Peet's name in a fundraising effort. In October 2010, Aegis yet again misleadingly represented its relationship with Peet's to potential investors. Once again, Peet's protested strongly.

Recently, in February 2011 Aegis again took Peet's name as its own, applying for a liquor license for a restaurant in Manhattan giving "Peet's Coffee/Preserve 24" as the trade name. Aegis purported to apologize, claiming "clerical error."

However, in March we learned that Aegis was circulating materials for a securities offering that, notwithstanding our instruction a year ago that use of the Peet's name should be cleared in advance, once again misstated and exaggerated Aegis's relationship with Peet's and revealed confidential Peet's information. Among many examples, Aegis's materials falsely inflated Aegis into a supposed "master licensee" of Peet's, when there is no such thing and when the only license it had was for kiosks in the BART system; they falsely stated that Aegis was in "partnership" with Peet's to develop a wide range of stores in the Northeast, when no such "partnership" exists; they cavalierly revealed confidential quality scores for Peet's owned stores as a group, and of Peet's licensees as a group; and they stated that Aegis's expansion "will include" development of "at least 15 Peet's licensed stores," when Peet's has given no such approvals. See Exhibit A hereto, pp. 3, 5 and 13-14. Further, an individual purporting to speak on behalf of Aegis emailed at least one prospective investor that Aegis is "the only Master Licensee of the Peet's name in the U.S.," and that Aegis "has the exclusive rights to expand the Peet's Coffee and Tea brand name to the East Coast" (see Exhibit B hereto), which are both flatly false.

70.   Further, by email dated February 14, 2011, Nathan P. McNamee, Total Wealth's President, furnished to Plaintiffs an Aegis Atlantic Business Plan, dated February 1, 2011, which contained various false and fraudulent statements regarding Aegis and Aegis's relationship with Peet's.  As explained in the Keim Affidavit:

On March 30, in response to our March 24 letter, Aegis furnished us with the Aegis Atlantic Business Plan, dated February 1, 2011, that was included in the offering document package along with the offering memorandum. See Exhibit A hereto. The Business Plan was even more egregious. It set out numerous false or misleading statements which falsely inflated the relationship with Peet's and traded on its name. These

included, among other things, the false claim that Aegis Holding was a "master licensee" of Peet's; the false claim that Aegis Holding had a "partnership with Peet's to design, develop and operate the various coffee café and retail stores that are the subject of this offering;" the statement that Aegis Holding's expansion in the Northeast "will include development of at least 15 Peet's licensed stores," falsely implying that Peet's had approved 15 licensed stores in the Northeast; and the statement that "Aegis affiliates are also planning to open Peet's cafes at Rockefeller Center, and the Chrysler Building," falsely implying that Peet's had approved kiosks at those locations when it did not even know about such plans. Ex. A hereto, pp. 3, 5-6, 13-14. Further, the Business Plan set out Peet's confidential information, such as confidential quality scores for Peet's corporate stores and for Peet's licensed kiosks, and sales information about a specific Peet's corporate store. Id., pp. 5, 7. Finally, the Business Plan conflated the BART license and Aegis' aspirations for expansion in the Northeast so as to create the misleading impression that Peet's had already licensed Aegis to pursue particular expansion opportunities in the Northeast.

This misleading impression permeates the Business Plan, but is particularly egregious in the section entitled "Our Relationship with Peet's Coffee & Tea" (pp. 13-14).

71.     In the February 14, 2011, email, Mr. McNamee represented as follows:

Attached is the latest material from the. Aegis Atlantic-development of Peet's coffee locations. I will be going to their home office in the Bay area in April where they will be opening all of their books to me. This is further due diligence out of duty not concern.

72.     The representations contained in the February 14, 2011 email were false and known by Defendants to be false.  Among other things, Mr. McNamee never visited Aegis's offices to conduct due diligence and never conducted any such due diligence. Had he done so, Total Wealth and Cooper would have immediately discovered the falsity of Aegis representations regarding its relationship with Peet's.

73.     Significantly, in support of its motion for a preliminary injunction, Aegis Retail filed with the New York court a schedule of all of its investors, listing their names, distributing investment adviser, and investment amounts. Of the 147 Aegis Retail debenture holders, at least 96 invested in Aegis Retail through Altus Fund. Altus Fund's public filings with the SEC indicate that it has 96 limited partner. The schedule notes that at least two other Aegis Retail investors had previously been with Altus Fund.

## **Total Wealth's Form ADV**

74.     Plaintiffs also discovered that Total Wealth misrepresented the extent of its compensation and fees. Form ADV is the uniform form used by investment advisers to register with both the SEC and state securities regulators. The form consists of two parts. On July 28, 2010, the SEC adopted revisions to Part 2A of Form ADV, requiring investment advisers to prepare narrative brochures written in plain English that contain information such as the types of advisory services offered, the adviser's fee schedule, disciplinary information, conflicts of interest, and the educational and business background of management and key advisory personnel of the adviser. The brochure is the primary disclosure document that investment advisers provide to their clients.

75.     On August 23, 2011, Total Wealth updated its firm brochure. Cooper executed the submission on Total Wealth's behalf and filed it with the SEC under penalty of perjury.

76.     According to Total Wealth's 2011 Firm Brochure:

a.     It may recommend to its clients that they invest in Altus Fund, depending on the client's sophistication, risk tolerance, qualifications, and stated investment objectives;

b.     Total Wealth has arrangements with the managers of underlying investments and securities whereby it or one of its affiliates will receive up to 50% of the management fees charged by the underlying investment managers on its clients' investments;

c.     Total Wealth's revenue sharing agreements create a conflict of interest in that such compensation "creates a financial incentive to recommend that clients purchase securities from funds that customarily provide for the Adviser to share in the investment advisory fees or to invest in funds with higher percentage splits of investment advisory fees";

d.     The .80% management fee charged by Total Wealth for managing Altus Fund is separate and apart from Total Wealth's expenses for providing investment advisory fees, transaction costs, or fees and costs charged by managers of the underlying investments;

e.     Total Wealth provides investment management services to Altus Fund according to the specific investment objectives outlined in the Altus PPM, not the specific investment objectives of investors in Altus Fund.

f.      "Funds of funds," such as Altus Fund, "carry high costs, substantial risks, such as the risks inherent in an investment in securities, as well as specific risks associated with each particular underlying fund's investment strategy."

## The Defendants' Scheme to Defraud

77.     Defendants orchestrated a fraudulent and deceptive scheme, plan and course of conduct, in connection with the purchase and sale of investment services and products, which was designed to indirectly effect and accomplish an unlawful public offering and distribution of securities.

78.     Cooper and Total Wealth Defendants manage, and recommend clients invest in, Altus Fund, which is itself a client of Total Wealth Defendants. Altus Fund is a so-called "fund- of-funds," i.e., a private equity fund whose investment strategy consists primarily in investing in the shares of other private funds and issuers.

79.     Because Altus Fund and the issuers or private funds in which it invested, such as Aegis Retail and PPCN (collectively, "Sub-funds"), were unregistered investment companies or issuers of unregistered securities, they could not effect a public distribution of their investment services or products while maintaining their exemptions from registration under Section 4(2) of the Securities Act, 15 U.S.C. § 77d(2) and/or Section 3(c)(1) of the Investment Company Act, 15 U.S.C. § 80a-3(c)(1), as provided for by Rules 501-506 of SEC Regulation D, 17 C.F.R. §§ 16      230.501-506.

80.     Regulation D provides a "safe harbor" from the registration provisions of the securities laws. Among other things, Regulation D sets forth the following pertinent conditions:

a.      An issuer must reasonably believe that there were no more than 35 purchasers, excluding "accredited investors," see Rule 501;

b.      The issuer must provide certain disclosure to prospective investors depending on whether they are accredited or unaccredited investors, see Rule 502(b);

c.      Neither the issuer nor anyone acting on its behalf shall offer or sell the securities by any form of general solicitation or general advertising, see Rule 502(c); and

d.      The issuer shall exercise reasonable care to assure that the purchasers of the securities are not underwriters—that is, persons acquiring the securities for the purpose of resale or otherwise offering, selling, or soliciting offers to buy securities in connection with a public distribution of those securities, see Rule 502(d).

81.     In pertinent part, Rule 501(a) defines "accredited investor" to include any organization described in section 501(c)(3) of the Internal Revenue Code with total assets in excess of $5,000,000 or any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000.

82.     Pursuant to their disclosure obligations under Rule 502(b), Altus Fund and the Sub-funds must, within a reasonable time prior to sale, disclose to:

a.      Unaccredited investors, certain financial and non-financial information as would be disclosed in a registration statement filed with the SEC; and

b.      Accredited and unaccredited investors, sufficient material information to satisfy with their obligations under any applicable anti-fraud provisions of the federal securities laws.

c.      Under Rule 502(c), Altus Fund and the Sub-funds are prohibited from engaging in general advertising and general solicitation, including, but not limited to, offers and sales of securities through media broadcasts, advertisements, newspaper articles, postings on an Internet website that is publicly available, or at seminars, conferences or meetings to which attendees have been invited by way of advertising. A general solicitation would not be deemed to occur in circumstances where there is a preexisting substantive relationship between Altus Fund and the Sub-funds or a placement agent and the prospective investor.

d.      The Sub-funds attempted to avoid engaging in a general solicitation by placing securities with clients of the Total Wealth Defendants who are accredited investors and with whom the latter have a preexisting, substantive relationship. Upon information and belief, Altus Fund is an "accredited investor."

e.      By selling their investment services and products to Altus Fund, the Sub-funds would look only to Altus Fund to discharge their obligations under Regulation D, and, presumably, would not be obligated to form a relationship with, or disclose any information to, Altus Fund's investors, such as Plaintiffs.

f.      The Sub-funds entered into agreements with Cooper and the Total Wealth Defendants to use the Altus Fund as a conduit for selling investment services and products to Altus Fund investors. Pursuant to these agreements, the Total Wealth Defendants would recommend investments in the Sub-funds to its clients, and in exchange, the Sub-funds pay Cooper and/or the Total Wealth Defendants up to 50% of all fees earned on those assets placed with the recommended Sub-fund and/or sales commissions on each transaction.

g.      The Sub-funds and the Total Wealth Defendants agreed to enter into these arrangements knowing that the Total Wealth Defendants' recommendations or exercise of discretionary authority would be the principal basis for clients'

investments in the Sub-funds, either independent of, or through, the Altus Fund vehicle.

h.      Unlike Altus Fund or the Sub-funds, the Total Wealth Defendants, as investment advisers, are permitted to advertise their investment services to the public. As more fully alleged herein, the Total Wealth Defendants advertised and solicited customers for investment services and securities using the MYOB radio and internet broadcasts.

i.      Upon information and belief, all or nearly all of these MYOB broadcasts promoted Total Wealth's model portfolios. These portfolios represented interests in the Altus Fund, and the "asset classes" that comprised the portfolios corresponded to the Sub-funds that were available for purchase through the Altus Fund. Some broadcasts, like the June 20, 2010 MYOB broadcast featuring Cooper and Hartman, expressly discussed features and attributes of the Sub-funds.

j.      In addition to general advertising, the MYOB broadcasts constitute a fraudulent bait-and-switch advertising scheme.      The "bait" was the solicitation of investment advisory clients. As with Plaintiffs, potential clients would contact the Total Wealth Defendants seeking those services. The Total Wealth Defendants would gather information concerning the potential client's net worth, investment objectives, investment time horizons, and risk tolerance. Upon determining that the potential client would be a possible candidate to invest in Altus Fund, the Total Wealth Defendants would construct and recommend a personalized portfolio for the client, based on each investor's individualized circumstances.

83.      The personalized portfolio, however, was the "switch." Rather than an actual portfolio of investments held with the Total Wealth Defendants, the personalized, recommended portfolio corresponded to an interest in Altus Fund. The Total Wealth Defendants' sales pitch failed to disclose that prospective clients were, in fact, purchasing Altus Fund securities. Indeed, the Total Wealth Defendants represented that the Altus

Fund was an "investment portal," similar to a brokerage account, in which the recommended securities would be held. Once the bait-and- switch was complete, the potential investment advisory clients purchased securities in the Altus Fund.

84.     After the clients' funds were deposited with Altus Fund, the Total Wealth Defendants would effectuate purchases in the Sub-funds corresponding to the Sub-funds that they recommended to the clients. Altus Fund purchased and held these securities "for the benefit of" the client. In so doing, Altus Fund completed the Sub-funds purchaser questionnaires as if Altus Fund, and not Plaintiffs, was the purchaser of the investment products and securities.

85.     However, Cooper and the Total Wealth Defendants did not inform Plaintiffs that Altus Fund was the "purchaser" of their investments in the Sub-funds. To the contrary, the Total Wealth Defendants represented to them that they were the "purchasers." After the transactions were complete, Cooper and the Total Wealth Defendants concealed these circumstances by causing Altus Fund to create account statements for Plaintiffs which reflected their interests in the Sub-funds.

86.     Cooper, the Total Wealth Defendants, Aegis Retail, Aegis Holding, PPCN and Hartman acted with the intent to defraud or with reckless disregard for the truth, in deceiving Plaintiffs, federal and state regulators, and the public at large by orchestrating an underwriting syndicate to offer unregistered securities to the public through general advertising and solicitation practices, using arrangements and practices designed to maximize fees and compensation to the scheme participants, and prevent disclosure of material information to would-be investors. As further alleged herein, these defendants' deliberately illegal behavior is a fraudulent scheme to indirectly accomplish what the securities and investment management laws have directly proscribed: a public distribution of unregistered securities issued and underwritten by unregulated investment companies, advisers and broker-dealers.

## The Defendants Were Not Entitled to Rely on Exemptions from Registration with the SEC

87.     In offering and selling their respective securities, Altus Fund, Aegis Retail, and PPCN relied on the "private offering" exemption from registration under Section 4(2) of the Securities Act, 15 U.S.C. § 77d(2), and Rule 506 of SEC Regulation D, 17 C.F.R. § 230.506.

88.     The Total Wealth Defendants and PPCN used the MYOB broadcasts over the radio and internet broadcasts to engage in an ongoing, indiscriminate general advertising and solicitation campaign to offer for sale and solicit offers to purchase the Altus Fund, Aegis Retail, and PPCN securities from potential customers with whom the Total Wealth Defendants had not yet developed a substantial relationship. These acts and practices constitute general advertising and solicitation prohibited by Section 4(2) and Rule 502(c) of SEC Regulation D, 17 C.F.R. § 230.502(c).

89.     Because Plaintiffs were unaccredited investors, the defendants can only qualify for the Regulation D safe harbor under Rule 506(b)(2)(ii) if the defendants had reasonable grounds to believe that Plaintiffs each had such knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of the prospective investments. As Defendants knew, however, Plaintiffs had no such knowledge or experience.  Thus, these defendants' sales of Altus Fund, Aegis Retail, and PPCN securities to Plaintiffs violated Rule 506(b)(2)(ii) of SEC Regulation D, 17 C.F.R. § 230. 506(b)(2)(ii) because they lacked a reasonable basis to believe that Plaintiffs had such knowledge and experience in financial and business matters that they were capable of evaluating the merits and risks of the prospective investments.

90.     As alleged herein, Plaintiffs were never provided with the offering memoranda for the Aegis Retail and PPCN securities prior to their purchases. Because Plaintiffs were unaccredited investors, these issuers also violated Rule 502(b)(2) of SEC Regulation D, 17 C.F.R. § 230.506(b)(2), by failing to furnish material financial and nonfinancial information of the kind and quality required to be included in a registration

statement filed under the Securities Act to Plaintiffs a reasonable time prior to sale of their respective securities.

### The Defendants' Misrepresentations and Omissions

91.    Cooper's representations in the June 20, 2010 and October 9, 2010 MYOB broadcasts concerning the Total Wealth model portfolios' performance were materially false or misleading in that Cooper:

a.    Failed to disclose the effect of material market or economic conditions on the results portrayed such that the performance data given would not be misleading to potential investors;

b.    Suggested or made claims about the potential for profit by selecting advantageous hypothetical performance results for Total Wealth model portfolios without also disclosing the possibility of loss using other less complimentary results from other Total Wealth model portfolios;

c.    Compared the hypothetical risk, performance and volatility of Total Wealth model portfolios against the S&P 500 without disclosing all material facts relevant to the comparison;

d.    Failed to disclose all material conditions, objectives, or investment strategies used to obtain the results portrayed by the Total Wealth model portfolios, including, but not limited to, representing that each Sub-fund was a type of asset, rather than a private fund or issuer;

e.    Failed to disclose prominently the limitations inherent in model results, particularly the fact that such results do not represent actual trading and that they may not reflect the impact that material economic and market factors and conflicts of interest might have had on Altus Capital's and/or Total Wealth's decision-making if the adviser were actually managing clients' money;

f.    Failed to disclose that the conditions, objectives, or investment strategies of the Total Wealth model portfolios changed materially during the time

period portrayed in the advertisement and, if so, the effect of any such change on the results portrayed;

g.     Failed to disclose that any of the securities contained in, or the investment strategies followed with respect to, the Total Wealth model portfolios do not relate, or only partially relate, to the type of advisory services currently offered by Altus Capital and/or Total Wealth;

h.     Failed to disclose that Altus Capital and/or Total Wealth's clients had investment results materially different from the results portrayed in the Total Wealth model portfolios;

i.     Failed to disclose that the Total Wealth model portfolio results portrayed relate only to a select group of Altus Capital and Total Wealth's clients, the basis on which the selection was made, and the effect of this practice on the results portrayed; and

j.     Failed to disclose that the Total Wealth model portfolios were interests in a "fund-of-funds" that specialized in high-risk unregistered securities that are only suitable for investors who are economically capable of withstanding a loss of their entire investment.

92.     Cooper made these representations with intent to defraud or with reckless disregard for the truth in that he knew, absent this information, his discussion of Total Wealth's model portfolios would be misleading because such disclosures are required under pertinent advertising regulations and boiler-plate, but incomplete, versions of such disclosures are found in the "fine-print" of the Altus Fund sales literature.

93.     The representations made by Cooper and Hartman during the June 20, 2010 MYOB broadcast concerning the PPCN securities were materially false and misleading in that Cooper and Hartman:

a. Represented that investments in the PPCN were safe because PPCN notes were collateralized by the "hard assets" underlying PPCN's loans when, as shown by the PPCN PPM, investors have no right of action against such assets;

b. Suggested that PPCN securities were "predicable and consistent earners for a lot of investors out there," when, as shown by the PPCN PPM, the securities were limited recourse instruments, meaning that PPCN was obligated to distribute interest only when it generated sufficient funds to pay investors; and

c. Recounted an anecdotal "success story" to create the impression that past gains could be realized or repeated in the future without qualifying or explaining the circumstances under     which such an impression would be justified under the circumstances, including, but not limited to, whether short-term bridge loan financing for real estate developers would be a growing enterprise given the lingering effects of market turbulence on commercial and residential real estate development.

94. Hartman made these representations with intent to defraud, or with reckless disregard for the truth in that the PPCN PPM, which he presumably participated in drafting, reviewed, and approved, are expressly contrary to his statements.

95. Cooper made these representations with intent to defraud or with reckless disregard for the truth in that he had access to the PPCN PPM and the issuer, and either knew his representations were false or failed to investigate PPCN's claims before repeating them on his radio show to promote investments in PPCN and Altus.

96. The representations made by Cooper, and attributable to the Total Wealth Defendants, during the meetings with Plaintiffs were materially false or misleading in that they:

a. Represented that Altus Fund was an "investment portal" rather than a limited partnership, thereby creating the misleading impression that placement of

Plaintiffs' money in Altus Fund was similar to depositing funds in a brokerage instead of a purchase of illiquid, unmarketable, and speculative securities;

b.     Represented that the investments recommended to Plaintiffs were consistent with their investment objectives, when, in fact,

i.     Altus Fund and Sub-fund interests were highly risky and speculative and were suitable only for investors capable of withstanding total loss of their investments, which is plainly unsuitable for the non-profit's conservative risk tolerance and stated objective of preserving investment capital; and

ii.     The Total Wealth Defendants did not memorialize any of Plaintiffs' financial needs profile including, but not limited to: (1) the investment time horizon; (2) risk tolerance; (3) the expected return on investment; (4) any asset class preferences, and (5) Plaintiffs' tax status.

c.     Represented that part of its due diligence process consisted of looking to whether the issuers or investment managers were subject to regulatory oversight, when, in fact, neither Altus Fund nor any of the Sub-funds were subject to such oversight;

d.     Compared the performance of Altus Fund against the S&P 500 index by using "cherry-picked" data that compared the returns on a $100,000 investment in Altus Fund against the S&P 500 by showing that the index lost nearly ¼ of its value from 2006- 2008, when the more accurate comparison, 2006-2010, would have shown that the S&P index increased by 11% from 2006-2010;

e.     Misrepresented that Total Wealth's only form of compensation was a management fee of once percent (1%) for managing Plaintiffs' investments;

f.     Represented that, notwithstanding the lock-up periods on the Sub-funds, Plaintiffs' funds could be easily liquidated by virtue of a gentlemen's

agreement between Cooper and the underlying investment managers, which Cooper could not enforce, or never existed.

97.     The Total Wealth Defendants made these representations with intent to defraud, or with reckless disregard for the truth in that these representations are contradicted by information contained in the various PPMs, which had not been disclosed to Plaintiffs, and Total Wealth's 2011 Form ADV Brochure, which the Total Wealth Defendants filed with the SEC under penalty of perjury.

98.     In addition, the representations by the Total Wealth Defendants, Aegis Retail, and Aegis Holding concerning the Aegis Retail securities were materially false and misleading in that the Total Wealth Defendants, Aegis Retail, and Aegis Holding:

    a.     Exaggerated the relationship between Aegis Retail and Peet's Coffee, by suggesting that Aegis Retail was a "Master Licensee" or the exclusive holder of rights to the Peet's Coffee brand in New York City;

    b.     Misrepresented the status of future Aegis Retail's licensing and branding opportunities with Peet's Coffee in the New York City market, given that as of the time of Plaintiffs' purchases, Aegis Holding affiliates were licensed only to operate kiosks in the BART mass transit system in the San Francisco Bay Area and Peet's Coffee supplies Aegis Retail with coffee at certain areas; and

    c.     Failed to disclose that Aegis Retail's IRR calculation spans a time frame (10 years) greater than the investment's life span (3 to 5 years), on the assumption that investors would automatically reinvest over the longer period, and failed to account for the cost of capital.

    d.     Fraudulently represented that the Total Wealth Defendants had conducted and were conducting due diligence on Aegis Retail when, in reality it did not conduct any such due diligence and was a co-conspirator with it with the intention of defrauding investors.

99.     In addition, the representations by the Total Wealth Defendants concerning the Aegis Retail debentures were additionally materially false and misleading in that the Total Wealth Defendants:

    a.     Failed to disclose or make available to Plaintiffs the Aegis Retail PPM, the disclosure of which is presumptively necessary to comply with anti-fraud laws;

    b.     Failed to disclose there was no personal property pledged as security for the Aegis Retail debentures; and

    c.     Failed to disclose the membership interest that was to be transferred to all investors such as Plaintiffs that purchased the Aegis Retail debentures.

100.    The Total Wealth Defendants Aegis Retail and Aegis Holding made these representations with intent to defraud, or with reckless disregard for the truth.

## PIERCING THE AEGIS CORPORATE VEIL

101.    Aegis Retail is, and at all times herein mentioned was, the alter ego of Goggin, Aegis Holding, and other companies and individuals sued herein as DOE defendants (collectively, the "Aegis Alter Egos").

102.    Upon information and belief, the Aegis Alter Egos are, and at all times herein mentioned were, the controlling shareholders or equity holders of Aegis Retail.

103.    Upon information and belief, the Aegis Alter Egos completely controlled, dominated, managed, and operated Aegis Retail.

104.    Upon information and belief, the Aegis Alter Egos ignored the corporate form of Aegis Retail by shifting revenues and expenses among Aegis Retail and themselves regardless of the origins of such revenues and expenses, such that any separateness between them has ceased to exist.

105.    Upon information and belief, the Aegis Alter Egos intentionally under-capitalized Aegis Retail and have secreted assets from Aegis Retail such that Aegis Retail is unable to pay its debts as they become due.

106.   Upon information and belief, the Aegis Alter Egos commingled funds with Aegis Retail and mixed personal assets and debts with corporate assets and debts.

107.   Upon information and belief, Aegis Retail has failed to hold annual meetings, record corporate minutes, and/or adhere to other corporate requirements as required by law.

108.   Evidencing the Aegis Alter Egos's commingling of Aegis Retail's funds, on June 6, 2013, Goggin sent a letter to Eugene, on **Aegis Holding** letterhead, stating that Aegis Retail could not repay its obligation to Plaintiffs for the following reason:

> As you may know **Aegis and its affiliates** have been engaged in a very large capital construction project as part of fulfilling its Business Plan on the east coast. As part of that effort Aegis just finished the buildout of a 6,000 sq. ft. Restaurant and Bar in the Lower Eastslde of Manhattan, Preserve24 (www Preserve24.com ).
>
> Unfortunately this project took longer and consumed more of our capital than anticipated. As a result Aegis had been delayed in meeting some of its debenture obligations including yours.

(Emphasis added.)

109.   All of the above rendered Aegis Retail a sham corporation and the alter ego of the Aegis Alter Egos.  Adherence to the fiction of a separate existence between the Aegis Alter Egos, on the one hand, and Aegis Retail, on the other hand, would permit abuse of the corporate privilege, sanction fraud and promote injustice.

110.   As a direct and proximate result of the above, the Aegis Alter Egos are responsible for Aegis Retail's obligations to Plaintiffs as alleged in this Complaint.

## FIRST CLAIM FOR RELIEF

### Violation of Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e, 77l(a)(1)

### (Against Total Wealth Defendants, Altus Fund, Aegis Retail, and PPCN)

111.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

112.   Plaintiffs assert this claim for relief under Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e, 77l(a)(1), with respect to its purchases of the Altus

Fund, Aegis Retail, and PPCN securities, as against the Total Wealth Defendants, Altus Fund, Aegis Retail, and PPCN.

113.   The Altus Fund limited partnership interests, the Aegis Retail debentures, and the PPCN promissory notes are all "securities" within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

114.   The Altus Fund, Aegis Retail, and PPCN securities were first sold to the public on December 8, 2009, August 1, 2010, and January 5, 2009, respectively. At all relevant times, the Altus Fund, Aegis Retail, and PPCN securities were not registered with the SEC.

115.   As further alleged herein, the Total Wealth Defendants and PPCN engaged in general advertising and solicitation prohibited by Section 4(2) and Rule 502(c) of SEC Regulation D, 17 C.F.R. § 230.502(c). In addition, the sales of the Altus Fund, Aegis Retail, and PPCN securities to Plaintiffs were made in violation of Rules 502(b)(2) and 506(b)(2)(ii) of SEC Regulation D, 17 C.F.R. §§ 230.506(b)(2)(ii) & 230.506(b)(2).

116.   The Total Wealth Defendants, Altus Fund, Aegis Retail, and PPCN were therefore not entitled to rely upon the "private offering" exemption from registration under Section 4(2) of the Securities Act, 15 U.S.C. § 77d(2), and Rule 506 of SEC Regulation D, 17 C.F.R. § 230.506.

117.   As a result of the above-described acts, the Total Wealth Defendants, Altus Fund, Aegis Retail, and PPCN are liable to Plaintiffs, who are entitled to, and hereby do, rescind the above-described purchases. Plaintiffs will tender the securities back to the Total Wealth Defendants, Altus Fund, Aegis Retail, and/or PPCN before entry of judgment.

118.   Total Wealth Defendants, Altus Fund, Aegis Retail, and PPCN are liable to Plaintiffs for the consideration paid by Plaintiffs for each of the securities, with interest thereon, less the amount of any income received thereon.

## SECOND CLAIM FOR RELIEF

### Violation of Section 15(a) of the Securities Act, 15 U.S.C. § 77o(a)

### (Against Total Wealth Defendants, Cooper, Hartman, Aegis Holding and Goggin)

119.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

120.   This claim for relief is asserted by Plaintiffs against the Total Wealth Defendants, Cooper, Hartman, and Aegis Holding under Section 15(a) of the Securities Act, 15 U.S.C. § 18 77o(a).

121.   The Total Wealth Defendants had the power to control, and did in fact control, Altus Fund in their capacities as general partners to the limited partnership. As such, the Total Wealth Defendants are jointly and severally liable with Altus Fund for Altus Fund's violation of Sections 5 and 12(a)(1) of the Securities Act.

122.   Cooper had the power to control, and did in fact control, Altus Fund in his capacity as general partner to the limited partnership or by virtue of his majority equity interests in and/or management positions with the limited partnership's general partner entity. Cooper also had the power to control, and did in fact control, the Total Wealth Defendants by virtue of his majority equity interest in and/or in his capacity as CEO and "Owner." As such, Cooper is jointly and severally liable with Altus Fund and the Total Wealth Defendants for their violations of Sections 5 and 12(a)(1) of the Securities Act.

123.   Hartman had the power to control, and did in fact control, PPCN in his capacity as PPCN's managing member. As such, Hartman is jointly and severally liable with PPCN for PPCN's violation of Sections 5 and 12(a)(1) of the Securities Act.

124.   Aegis Holding and Goggin had the power to control, and did in fact control, Aegis Retail in their capacity as Aegis Retail's managing member and Aegis Retail's CEO, respectively. As such, Aegis Holding and Goggin are jointly and severally liable with Aegis Retail for Aegis Retail's violation of Sections 5 and 12(a)(1) of the Securities Act.

**THIRD CLAIM FOR RELIEF**

**Violation of Section 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc(b)**

**(Against Total Wealth Defendants, Altus Fund, Aegis Retail, and PPCN)**

125.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

126.   Plaintiffs assert this claim for relief under Section 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc(b), with respect to the Altus Fund Limited Partnership Agreement and the Altus Fund, Aegis Retail, and PPCN Subscription Agreements, as against the Total Wealth Defendants, Altus Fund, Aegis Retail, and PPCN.

127.   Pursuant to Section 29(b), a contract is unenforceable and subject to a private cause of action for rescission if it violates, by its terms or by its performance, the Securities Exchange Act, or any rule or regulation thereunder.

128.   The Altus Fund Limited Partnership and Subscription Agreements, Aegis Retail Subscription Agreement, and PPCN Subscription Agreement entered into by Plaintiffs should be rescinded under Section 29(b) because Total Wealth Defendants, Altus Fund, Aegis Retail, and PPCN violated the general antifraud provisions of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and SEC Rule 10b-5(a) & (c), 17 C.F.R.§ 240.10b-5(a) & (c) promulgated thereunder.

129.   As more fully described above, Total Wealth Defendants, Cooper, Altus Fund, Aegis Retail, and PPCN violated Section 10(b) and SEC Rule 10b-5 in that they:

a.     individually and in concert, directly and indirectly, caused these agreements to be executed by the use and means of instrumentalities of interstate commence and/or the mails in connection with the sale or purchase of the Altus Fund, Aegis Retail, or PPCN securities;

b.     knowingly, intentionally, and/or recklessly

i.     employed devices, schemes and artifices to defraud Plaintiffs; and

      ii.     engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs.

    c.    acted with scienter, i.e., they either had actual knowledge of the fraudulent schemes, acts and practices and material misrepresentations and omissions as set forth herein, or acted with deliberate or conscious recklessness as to the misrepresentations' or omissions' truth or falsity or failed to ascertain and disclose the true facts underlying these schemes, acts, and practices, even though such facts were available to them.

130.   Alternatively, the Altus Fund Limited Partnership and Subscription Agreements, Aegis Retail Subscription Agreement, and PPCN Subscription Agreement entered into by Plaintiffs should be rescinded under Section 29(b) because Total Wealth Defendants violated Section 15(a) of the Securities Exchange Act, 15 U.S.C. § 78o, which prohibits transactions by unregistered securities brokers and dealers.

131.   The Total Wealth Defendants violated Section 15(a) in that:

    a.    They effected securities transactions as brokers and dealers within the meaning of Section 15(a)(1);

    b.    They failed to maintain broker or dealer registration with the SEC or California regulators as required by pertinent licensing statutes and regulations;

    c.    They directly or indirectly received fees from Plaintiffs, Altus Fund, Aegis Retail, Aegis Holding, PPCN and/or Hartman for effecting sales of the Altus Fund, Aegis Retail, and PPCN securities;

    d.    Aegis Retail, Aegis Holding, PPCN and/or Hartman knew or should have known that Total Wealth Defendants were not registered broker-dealers with the SEC;

    e.    Plaintiffs were not aware that Total Wealth Defendants were acting as broker-dealers and were led to believe that Total Wealth Defendants were acting as their investment advisers.

132.   As a result of the above-described acts, the Total Wealth Defendants, Altus Fund, Aegis, and PPCN are liable to Plaintiffs, who are entitled to, and hereby do, rescind the above- described purchases. Plaintiffs will tender the securities back to the Total Wealth Defendants, Altus Fund, Aegis Retail, and/or PPCN before entry of judgment.

133.   Accordingly, the Altus Fund Limited Partnership and Subscription Agreements, Aegis Retail Subscription Agreement, and PPCN Subscription Agreement entered into by Plaintiffs should be voided and the principal amount of their investment refunded to Plaintiffs, with interest thereon, less the amount of any income received thereon.

## FOURTH CLAIM FOR RELIEF

**Violation of Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a)**

**(Against Total Wealth Defendants, Cooper, Hartman, Aegis Holding, and Goggin)**

134.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

135.   This claim for relief is asserted by Plaintiffs against Total Wealth Defendants, Cooper, Hartman, and Aegis Holding under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).

136.   The Total Wealth Defendants had the power to control, and did in fact control, Altus Fund in their capacities as general partners to the limited partnership. As such, the Total Wealth Defendants are jointly and severally liable with Altus Fund for Altus Fund's violation of Section 29 of the Securities Exchange Act, and the associated underlying violations of Sections 10(b) and 15(a) and SEC Rule 10b-5 promulgated thereunder.

137.   Cooper had the power to control, and did in fact control, Altus Fund in his capacity as general partner to the limited partnership or by virtue of his majority equity interests in and/or management positions with the limited partnership's general partner entity. Cooper also had the power to control, and did in fact control, the Total Wealth

Defendants by virtue of his majority equity interest in and/or in his capacity as CEO and "Owner." As such, Cooper is jointly and severally liable with Altus Fund and the Total Wealth Defendants for their violations of Section 29 of the Securities Exchange Act, and the associated underlying violations of Sections 10(b) and 15(a) and SEC Rule 10b-5 promulgated thereunder.

138.   Hartman had the power to control, and did in fact control, PPCN in his capacity as PPCN's managing member. As such, Hartman is jointly and severally liable with PPCN for PPCN's violation of Section 29 of the Securities Exchange Act, and the associated underlying violations of Sections 10(b) and 15(a) and SEC Rule 10b-5 promulgated thereunder.

139.   Aegis Holding and Goggin had the power to control, and did in fact control, Aegis Retail in their capacity as Aegis Retail's managing member and Aegis Retail's CEO, respectively. As such, Aegis Holding and Goggin are jointly and severally liable with Aegis Retail for Aegis Retail's violation of Section 29 of the Securities Exchange Act, and the associated underlying violations of Sections 10(b) and 15(a) and SEC Rule 10b-5 promulgated thereunder.

## FIFTH CLAIM FOR RELIEF

### Violation of Section 47(b) of the Investment Company Act, 15 U.S.C. § 80a-46(b)
### (Against Altus Fund and PPCN)

140.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

141.   Plaintiffs assert this claim for relief under Section 47(b) of the Investment Company Act, 15 U.S.C. § 80a-46(b), with respect to the Altus Fund Limited Partnership Agreement and the Altus Fund, and PPCN Subscription Agreements, as against Altus Fund and PPCN.

142.   Altus Fund and PPCN are engaged primarily in the business of investing, reinvesting, or trading in securities, and are therefore "investment companies" within the

meaning of Section 3(a)(1)(A) of the Investment Company Act, 15 U.S.C. § 80a-3(a)(1)(A).

143.   Under Section 8 of the Investment Company Act, 15 U.S.C. § 80a-8, all investment companies must register with the SEC.

144.   Among other things, Section 7(a) of the Investment Company Act, 15 U.S.C. § 80a-7(a) prohibits unregistered investment companies from:

      a.    offering for sale, selling, or delivering after sale any security or interest in a security by use of any means or instrumentality of interstate commerce;

      b.    purchasing, redeeming, retiring, or otherwise acquiring or attempting to acquire any security or interest in a security by use of any means or instrumentality of interstate commerce; and

      c.    otherwise engaging in any business in interstate commerce.

145.   At all relevant times, neither Altus Fund nor PPCN was registered with the SEC.

146.   As further alleged herein, the Total Wealth Defendants and PPCN engaged general advertising and solicitation prohibited by Section 3(c)(1). In addition, the sales of the Altus Fund and PPCN securities to Plaintiffs were made in violation of Rules 502(b)(2) and 506(b)(2)(ii) of SEC Regulation D, 17 C.F.R. §§ 230.506(b)(2)(ii) & 230.506(b)(2).

147.   Altus Fund and PPCN were therefore not entitled to rely on the "private investment company" exemption from registration found in Section 3(c)(1) of the Investment Company Act, 15 U.S.C. § 80a-3(c)(1).

148.   Moreover, each of the Altus fund investors that purchased an interest in PPCN securities held by Altus Fund must be counted as a beneficial owner of PPCN securities. Altus Fund investors purchase interests corresponding to underlying securities held by Altus Fund for their benefit on the basis of personalized investment recommendations and advice consistent with their own individualized investment

objectives. Plaintiffs are informed and believe, and thereon allege, that the total sum of PPCN investors and beneficial owners of PPCN securities held through Altus Fund is in excess of Section 3(c)(1)'s 100 beneficial owner limit. For this additional reason, PPCN was not entitled to rely on Section 3(c)(1)'s "private investment company" exemption from registration.

149. Pursuant to section 47(b) of the Investment Company Act, 15 U.S.C. § 80a-46(b), a contract is unenforceable and subject to a private cause of action for rescission if it violates, by its terms or by its performance, the Investment Company Act, or any rule or regulation thereunder.

150. The Altus Fund Limited Partnership and Subscription Agreements, the Aegis Retail Subscription Agreement and the PPCN Subscription Agreement should be rescinded under Section 47(b) because Altus Fund violated Section 7(a)(1) when it:

      a. offered for sale and sold the Altus Fund, Aegis Retail, and PPCN securities through the use of means and instrumentalities of interstate commerce;

      b. attempted to acquire and thereafter purchased the Aegis Retail and PPCN securities for the benefit of Plaintiffs through the use of means and instrumentalities of interstate commerce; and

      c. otherwise engaged in the business of investing, reinvesting, or trading in securities through the use of means and instrumentalities of interstate commerce.

151. The Altus Fund Limited Partnership and Subscription Agreements, the Aegis Retail Subscription Agreement and the PPCN Subscription Agreement should be rescinded under Section 47(b) because PPCN violated Section 7(a)(1) when it:

      a. offered for sale and sold the PPCN security through the use of means and instrumentalities of interstate commerce; and

      b. otherwise engaged in the business of investing, reinvesting, or trading in securities through the use of means and instrumentalities of interstate commerce;

152.   As a result of the above-described acts, Altus Fund and PPCN are liable to Plaintiffs, which are entitled to, and hereby do, rescind the above-described purchases. Plaintiffs will tender the securities back to the Altus Fund and PPCN before entry of judgment.

153.   Accordingly, the Altus Fund Limited Partnership and Subscription Agreements, the Aegis Retail Subscription Agreement and the PPCN Subscription Agreement should be voided and the principal amount of their investment refunded to Plaintiffs, with interest thereon, less the amount of any income received thereon.

## SIXTH CLAIM FOR RELIEF

### Violation of Section 215(b) of the Investment Advisers Act, 15 U.S.C. § 80b-15(b)
### (Against Altus Capital and Total Wealth)

154.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

155.   Plaintiffs assert this claim for relief under Section 215(b) of the Investment Advisers Act, 15 U.S.C. § 80b-15(b), with respect to the Altus Fund Limited Partnership Agreement as against Altus Fund Capital and Total Wealth.

156.   Pursuant to Section 215(b), a contract is unenforceable and subject to a private cause of action for rescission if it violates, by its terms or by its performance, the Investment Advisers Act, or any rule or regulation thereunder.

157.   The Altus Fund Limited Partnership Agreement is an "investment advisory contract" within the meaning of Section 205(d) of the Investment Advisers Act, 15 U.S.C. § 80b- 5(d), because it is a contract whereby Altus Capital and Total Wealth agreed to act as investment adviser to Altus Fund and to manage the investment accounts of Plaintiffs, neither of which is a registered investment company.

158.   The Altus Fund Limited Partnership Agreement should be rescinded under Section 215(b) because Altus Capital and Total Wealth violated the general antifraud provisions of Section 206(4) of the Investment Advisers Act, 15 U.S.C. § 80b-6 and SEC

Rules 206(4)-1 20 and 206(4)-8, 17 C.F.R.§§ 275.206(4)-1 & 275.206(4)-8 promulgated thereunder.

159.    Section 206(4) and Rule 206(4)-1(a)(5) make it unlawful for an investment adviser to distribute advertising materials that contain untrue statements of material facts or are otherwise false or misleading. As more fully described above, Altus Capital and Total Wealth violated Section 206(4) and Rule 206(4)-1(a)(5) in that they:

a.    used the means and instrumentalities of interstate commerce to

b.    knowingly, intentionally, recklessly, or negligently publish, circulate, or distribute advertisements for investment advisory services with regard to securities, which contained untrue statements of material facts, or which are otherwise false or misleading.

160.    Alternatively, Section 206(4) and Rule 206(4)-8(a) make it unlawful for any investment adviser to a pooled investment vehicle to engage in certain conduct defined by the SEC as fraudulent, deceptive, or manipulative acts, practices, or courses of business. As more fully described above, Altus Capital and Total Wealth violated Section 206(4) and Rule 206(4)- 8(a) in that:

a.    Altus Capital and Total Wealth are investment advisers to Altus Fund, a "pooled investment vehicle" within the meaning of Rule 206(4)-8(b); and

b.    Altus Capital and Total Wealth

i.    made untrue statements of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to Plaintiffs, prospective investors in Altus Fund; or

ii.    engaged in acts, practices, and courses of business that are fraudulent, deceptive, or manipulative with respect to Plaintiffs, prospective investors in Altus Fund.

161.   As a result of the above-described acts, Altus Capital and Total Wealth are liable to Plaintiffs, who are entitled to, and hereby do, rescind the above-described purchases. Plaintiffs will tender the securities back to Altus Capital and Total Wealth before entry of judgment.

162.   Accordingly, the Altus Fund Limited Partnership Agreement should be voided and the principal amount of their investment refunded to Plaintiffs, with interest thereon, less the amount of any income received thereon.

## SEVENTH CLAIM FOR RELIEF

### Violation of Cal. Corp. Code § 25503

### (Against Total Wealth Defendants, Altus Fund, Aegis Retail, and PPCN)

163.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

164.   Plaintiffs bring this claim for relief pursuant to Sections 25110 and 25503 of the California Corporations Code, with respect to their purchases of the Altus Fund, Aegis Retail, and PPCN securities, as against the Total Wealth Defendants, Altus Fund, Aegis Retail, and PPCN.

165.   The Altus Fund, Aegis Retail, and PPCN securities are not "covered securities" within the meaning of the National Securities Markets Improvement Act of 1996, 15 U.S.C. § 77r, because those securities were not traded on national exchanges, were not issued by registered investment companies, and were not entitled to rely on an exemption from registration with the SEC.

166.   The Total Wealth Defendants, Altus Fund, Aegis, and PPCN offered and sold, or otherwise participated in the offer and sale, to limited partnership interests, senior debentures, and promissory notes to Plaintiffs. Altus Fund, Aegis Retail, and PPCN were the issuers of the investments and engaged in the trading of such securities, with the assistance of the Total Wealth Defendants, who acted as underwriters of the offering.

167.    The sales constituted issuer transactions in that they were part of an initial offering of membership interests for capitalization purposes for the various entities and the issuers directly benefitted from Plaintiffs' investments and received a portion of the investments as the securities' respective issuers. At the time of Plaintiffs' acquisitions, the sales were subject to qualification, were not exempt from qualification, and were not, as of the date of this Complaint, qualified as any kind of securities transaction with the California Commissioner of Corporations.

168.    The Total Wealth Defendants, Altus Fund, Aegis Retail, and PPCN sold the aforementioned securities in California.

169.    As a result of the above-described acts, the Total Wealth Defendants, Altus Fund, Aegis Retail, and PPCN are liable to Plaintiffs, who are entitled to, and hereby do, rescind the above-described purchases. Plaintiffs will tender the securities back to the Total Wealth Defendants, Altus Fund, Aegis Retail, and/or PPCN before entry of judgment.

170.    Plaintiffs are informed and believe that the consideration given for the securities herein may not be capable of being returned in that Altus Fund, Aegis Retail, and/or PPCN may have lost this capital as a result of undisclosed business risk or may be contractually prevented from refunding this capital despite the Total Wealth Defendants' representations to the contrary.

171.    Accordingly, Plaintiffs seek an order of this Court for all appropriate available remedies under California Corporations Code §§ 25503, i.e., the consideration paid by Plaintiffs for these investments should be refunded to them, with interest thereon, less the amount of any income received thereon, or damages in an amount to prove at trial.

**EIGHTH CLAIM FOR RELIEF**

**Violation of Cal. Corp. Code § 25501**

**(Against Total Wealth Defendants, Cooper, Altus Fund, Aegis Retail, and PPCN)**

172.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

173.   Plaintiffs bring this claim for relief pursuant to Sections 25401 and 25501 of the California Corporations Code, with respect to its purchases of the Altus Fund, Aegis Retail, and PPCN securities, as against the Total Wealth Defendants, Cooper, Altus Fund, Aegis Retail, and PPCN.

174.   As more fully alleged above, the Total Wealth Defendants, Cooper, Altus Fund, Aegis Retail, and PPCN offered to sell and sold for their own financial gain the Altus Fund, Aegis Retail, and PPCN securities to Plaintiffs by means of written and/or oral communications which included untrue statements of material fact and omissions of material facts that were necessary to make the statements made not misleading.

175.   The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

176.   The Total Wealth Defendants, Cooper, Altus Fund, Aegis Retail, and PPCN sold the aforementioned securities in California.

177.   As a result of the above-described acts, the Total Wealth Defendants, Cooper, Altus Fund, Aegis Retail, and PPCN are liable to Plaintiffs, who are entitled to, and hereby do, rescind the above-described purchases. Plaintiffs will tender the securities back to the Total Wealth Defendants, Cooper, Altus Fund, Aegis Retail, and/or PPCN before entry of judgment.

178.   Plaintiffs are informed and believe that the consideration given for the securities herein may not be capable of being returned in that Altus Fund, Aegis Retail,

and/or PPCN may have lost this capital as a result of undisclosed business risk or may be contractually prevented from refunding this capital despite representations by the Total Wealth Defendants and Cooper to the contrary.

179.   Accordingly, Plaintiffs seek an order of this Court for all appropriate available remedies under California Corporations Code § 25501, i.e., either the consideration paid by Plaintiffs for these investments should be refunded to them, with interest thereon, less the amount of any income received thereon, or damages in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF

### Violation of Cal. Corp. Code § 25500

### (Against Total Wealth Defendants, Cooper, Aegis Retail and Aegis Holding)

180.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

181.   Plaintiffs bring this claim for relief pursuant to Sections 25400(d) and 25500 of the California Corporations Code, with respect to its purchases of the Altus Fund and Aegis securities, as against the Total Wealth Defendants, Cooper, Aegis Retail, and Aegis Holding.

182.   At all relevant times and as more fully alleged above, the Total Wealth Defendants and Cooper:

a.   Offered for sale and sold Altus Fund securities;

b.   Made or caused to be made statements in its written proposal and during the oral presentations to Plaintiffs which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts or which omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

c.     Knew or had reasonable ground to believe that such statements were false or misleading and willfully made or participated in the making of such false and misleading statements with the intent to affect the price of Altus Fund securities and to induce the purchase of such securities; and

d.     Such conduct occurred in California, including, but not limited to, the maintenance of substantial business operations, the distribution and publication of false and misleading statements, and the offer for sale and sale of Altus Fund securities.

183.   At all relevant times and as more fully alleged above, the Total Wealth Defendants, Cooper, Aegis Retail and Aegis Holding:

a.     Offered for sale and sold Aegis securities;

b.     Made or caused to be made statements concerning Aegis Retail's relationship with Peet's Coffee which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts or which omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

c.     Knew or had reasonable ground to believe that such statements were false or misleading and willfully made or participated in the making of such false and misleading statements with the intent to affect the price of Aegis Retail's securities and to induce the purchase of such securities; and

d.     Such conduct occurred in California, including, but not limited to, the maintenance of substantial business operations, the distribution and publication of false and misleading statements, and the offer for sale and sale of Aegis Retail's securities.

184.   The above-described acts of these defendants affected the price of the Altus Fund and Aegis Retail securities, and, as a result, Plaintiffs sustained damages equal to the

difference between the price they paid for these securities, and the amount they would have paid in the absence of such acts.

185.   Accordingly, Plaintiffs are entitled to an award of damages in an amount to be proven at trial, with interest thereon.

## TENTH CLAIM FOR RELIEF

### Violation of Cal. Corp. Code § 25501.5

### (Against Total Wealth Defendants)

186.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

187.   Plaintiffs bring this claim for relief pursuant to Section 25501.5 of the California Corporations Code, with respect to its purchases of the Altus Fund and Aegis Retail securities, as against the Total Wealth Defendants.

188.   At the time of sale of the Altus Fund, Aegis Retail, and PPCN securities, the Total Wealth Defendants were required to be licensed as broker-dealers, but had not applied for and secured from the California Commissioner of Corporations a certificate under California Corporations Code section 25210, et seq., authorizing those defendants to act in that capacity.

189.   As a result of the above-described acts, the Total Wealth Defendants are liable to Plaintiffs, who are entitled to, and hereby do, rescind the above-described purchases. Plaintiffs will tender the securities back to the Total Wealth Defendants before entry of judgment.

190.   Plaintiffs are informed and believe that the Total Wealth Defendants caused it injury or damage as a result of performing services for which a license was required under California Corporations Code section 25210, et seq. Plaintiffs are therefore entitled to treble damages as provided in California Civil Procedure Code section 1029.8.

191.   As a direct and proximate result of the Total Wealth Defendants' conduct, Plaintiffs have been forced to retain counsel to bring this litigation. Accordingly, Plaintiffs will seek attorney's fees and costs, according to proof.

## ELEVENTH CLAIM FOR RELIEF

### Violation of Cal. Corp. Code § 25504

### (Against the Total Wealth Defendants, Cooper, Hartman, Aegis Holding, and Goggin)

192.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

193.   Plaintiffs bring this claim for relief for joint and several liability pursuant to Section 25504 of the California Corporations Code, against the Total Wealth Defendants, Cooper, Hartman, and Aegis Holding:

194.   The Total Wealth Defendants are jointly and severally liable with:

a.   Altus Fund, for its violations of Sections 25501 and 25503 of the California Corporations Code, as the limited partnership's general partners and management principals, and acted as the underwriters, broker-dealers, or agents who materially aided the transactions alleged above;

b.   Aegis Retail, for its violations of Sections 25501 and 25503 of the California Corporations Code, in that it acted as the underwriters, broker-dealers, or agents who materially aided the transactions alleged above;

c.   PPCN, for its violations of Sections 25501 and 25503 of the California Corporations Code, in that it acted as the underwriters, broker-dealers, or agents who materially aided the transactions alleged above.

195.   Cooper is jointly and severally liable with:

a.   The Total Wealth Defendants, for their violations of Sections 25501 and 25503 of the California Corporations Code, in that he directly or indirectly controls the Total Wealth Defendants by virtue of his majority equity interest in the two entities, is a principal member of the management of the Total Wealth

Defendants as their CEO, and acted as the underwriter, broker-dealer, or agent who materially aided the transactions alleged above;

b. Altus Fund, for its violations of Sections 25501 and 25503 of the California Corporations Code, in that he directly or indirectly controlled Altus Fund by virtue of his majority equity interest in, and principal management position with, the Altus Fund's limited partnership's general partners, his being one of the Altus Fund limited partnership's general partners, and acted as the underwriter, broker-dealer, or agent who materially aided the transactions alleged above;

c. Aegis Retail, for its violations of Sections 25501 and 25503 of the California Corporations Code, in that he acted as the underwriter, broker-dealer, or agent who materially aided the transactions alleged above;

d. PPCN, for its violations of Sections 25501 and 25503 of the California Corporations Code, in that he acted as the underwriter, broker-dealer, or agent who materially aided the transactions alleged above;

196. Aegis Holding and Goggin are jointly and severally liable with Aegis Retail for its violations of Sections 25501 and 25503 of the California Corporations Code, in that they are principal members of the management of Aegis Retail as its managing member and its CEO.

197. Hartman is jointly and severally liable with PPCN for its violations of Sections 25501 and 25503 of the California Corporations Code, in that he is a principal member of the management of PPCN as its managing member.

198. Accordingly, these defendants are liable to Plaintiffs jointly and severally with and to the same extent as such primary violators pursuant to Section 25504.

COMPLAINT AND JURY DEMAND

## **TWELFTH CLAIM FOR RELIEF**

### **Violation of Cal. Corp. Code § 25504.1**

### **(Against Aegis Retail, Aegis Holding, Goggin, PPCN, and Hartman)**

199.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

200.   Aegis Retail is jointly and severally liable with Altus Fund and the Total Wealth Defendants, in that it materially aided these defendants' primary violations of Sections 25110 and 25401 of the California Corporations Code with the intent to deceive or defraud by, among other things, facilitating and approving the distribution of its securities through Altus Fund and participating in the preparation, approval, and dissemination of Altus Fund and the Total Wealth Defendants' false and misleading statements concerning Aegis Retail and its relationship with Peet's Coffee with knowledge of the falsity of those statements.

201.   Aegis Holding and Goggin are jointly and severally liable with Altus Fund and the Total Wealth Defendants, in that they materially aided these defendants' primary violations of Sections 25110 and 25401 with the intent to deceive or defraud by, among other things, facilitating and approving the distribution of Aegis Retail securities through Altus Fund and participating in the preparation, approval, and dissemination of Altus Fund and the Total Wealth Defendants' false and misleading statements concerning Aegis Retail and its relationship with Peet's Coffee with knowledge of the falsity of those statements.

202.   PPCN is jointly and severally liable with Altus Fund and the Total Wealth Defendants, in that it materially aided these defendants' primary violations of Sections 25110 and 25401 with the intent to deceive or defraud, by, among other things, facilitating and approving the distribution of its securities through Altus Fund and participating in the preparation, approval, and dissemination of Altus Fund and the Total Wealth Defendants'

false and misleading statements concerning PPCN's business activities and risk with knowledge of the falsity of those statements.

203.   Accordingly, these defendants are liable to Plaintiffs jointly and severally with and to the same extent as such primary violators pursuant to California Corporations Code section 25504.1.

## THIRTEENTH CLAIM FOR RELIEF

### Violation of Bus. & Prof. Code § 17200

### (Against All Defendants)

204.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

205.   California's Unfair Competition Law, Business & Professions Code section 17200 et seq., prohibits acts of unfair competition, which include any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

206.   Defendants' practices, individually and in the aggregate, are unlawful in that they constitute, in the aggregate, a scheme to engage in a public distribution of securities to the public in contravention of federal and state securities and investment management laws requiring registration of securities with regulators and meaningful and truthful disclosure of material information to potential investors, including Plaintiffs.

207.   The Total Wealth Defendants and Cooper are registered investment advisers or investment adviser representatives, and thus, their practices are also unlawful to the extent that each of the acts alleged above:

a.     Violates Sections 25235(a) & (b) of the California Corporations Code, which prohibit such defendants from:

i.     Employing devices, schemes, or artifices to defraud Plaintiffs, clients or prospective clients; and

ii.     Engaging in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon Plaintiffs, clients or prospective clients.

b.     Violates Section 25235(d) of the California Corporations Code, and 10 C.C.R. § 260.235(a)(5), promulgated thereunder, which prohibit such defendants from publishing, circulating, or distributing advertisements for investment advisory services with regard to securities, which contain untrue statements of material facts, or which are otherwise false or misleading;

c.     Violates Section 25235(d) of the California Corporations Code, and 10 C.C.R. § 260.238(a), (h), (k) & (o), promulgated thereunder, which prohibit such defendants from engaging or attempting to engage in investment advisory activities in California that do not promote fair, equitable, and ethical principals as defined by the California Commissioner of Corporations, namely:

i.     Recommending to Plaintiffs the purchase of the Altus Fund, Aegis Retail, and PPCN securities without reasonable grounds to believe that the recommendation is suitable for Plaintiffs on the basis of information furnished by Plaintiffs after reasonable inquiry concerning Plaintiffs' investment objectives, financial situation and needs, and any other information known or acquired by these defendants;

ii.     Misrepresenting to Plaintiffs these defendants' qualifications, or misrepresenting the nature of the advisory services being offered or fees to be charged for such service, or omitting to state a material fact necessary to make the statements made regarding the qualifications, services or fees, in light of the circumstances under which they are made, not misleading;

iii.     Failing to disclose in writing and before entering into or renewing an advisory agreement with Plaintiffs any material conflict of interest relating to these defendants, which could be reasonably expected to impair the rendering of unbiased and objective advice;

iv.     Making any untrue statement of a material fact or omitting a statement of material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading in the solicitation of Plaintiffs.

d.     Violates Section 25404(a) of the California Corporations Code, which makes it unlawful for Defendants to knowingly alter, destroy, mutilate, conceal, cover up, falsify, or make a false entry in any record or document with the intent to impede, obstruct, or influence the administration or enforcement of California's securities laws.

208.  Defendants' practices, individually and in the aggregate, are unfair as offensive of, and contrary to, established public policy and caused substantial injuries to consumers, including Plaintiffs, such injuries outweigh any benefits inherent to such practices, and consumers, including Plaintiffs, themselves could not have reasonably avoided given that the practices are specifically designed to avoid regulatory oversight and disclosure of meaningful, truthful, and material information and thereby create or take advantage of an obstacle to the free exercise of consumer decision-making.

209.  Defendants' practices, individually and in the aggregate, are fraudulent in that they knowingly or negligently advertised, promoted, solicited, and sold investment advisory services or securities through representations in widely-disseminated radio and internet broadcasts, written proposals, and offering documents and memoranda, which are untrue or likely to mislead or deceive the public concerning material aspects of the investment advisory services or securities so advertised, promoted, solicited, or sold.

210.   Defendants' practices, individually and in the aggregate, are unlawful and fraudulent in that they knowingly or negligently advertised, promoted, solicited, and sold investment advisory services or securities through representations in widely-disseminated radio and internet broadcasts, written proposals, and offering documents and memoranda in violation of Section 17(a) of the Securities Act, 15 U.S.C. 77q(a), and SEC Rule 156, 17 C.F.R. § 230.156, promulgated thereunder, which prohibits defendants from using sales literature in connection with the offer or sale of securities issued by an investment company if it:

        a.    Contains an untrue statement of a material fact; or

        b.    Omits to state a material fact necessary in order to make a statement made, in the light of the circumstances of its use, not misleading.

211.   Plaintiffs suffered injury in fact and have lost money or property as a result of Defendants' business practices. Plaintiffs gave over to Defendants certain monies when they received investment advisory and/or broker-dealer services from the Total Wealth Defendants and Cooper, and purchased the Altus Fund, Aegis Retail, and PPCN securities. Defendants refuse to return such monies or otherwise provide Plaintiffs with the services and products they promised to perform and deliver.

212.   Accordingly, Defendants are liable to Plaintiffs, who are entitled to, and hereby request the Court enter such orders or judgments as may be necessary to restore to them such monies and property which may have been acquired by means of such unfair competition.

## FOURTHTEENTH CLAIM FOR RELIEF

### Rescission for Constructive Fraud

### (Against Altus Fund, Cooper and the Total Wealth Defendants)

213.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

214.   Plaintiffs assert this claim for relief to obtain rescission of the Altus Fund Limited Partnership and Subscription Agreements, as against Altus Fund, Cooper, and the Total Wealth Defendants.

215.   As alleged above, Cooper and the Total Wealth Defendants solicited Plaintiffs' business by holding themselves out as registered investment advisers and proposed entering into a position of trust and confidence as Plaintiffs' investment advisers. In reliance on these representations, Plaintiffs executed and delivered the Altus Fund Limited Partnership and Subscription Agreements.

216.   A confidential relationship existed between Plaintiffs and Cooper and the Total Wealth Defendants. As general partners of Altus Fund and as agents, investment advisers and/or broker-dealers with discretionary authority over Plaintiffs' trading and investment funds and accounts, Cooper and the Total Wealth Defendants owed fiduciary duties to Plaintiffs. In particular, Cooper and the Total Wealth Defendants owed Plaintiffs a fiduciary duty of utmost care, integrity, honesty and loyalty in their dealings with Plaintiffs, a duty of diligent exercise of reasonable skill and care in the performance of their duties, a duty of honest and fair dealing and good faith, and a duty to disclose all material facts that these defendants knew, or should have known, concerning the investment strategies or securities they recommended to Plaintiffs.

217.   Cooper and the Total Wealth Defendants breached their duty to Plaintiffs by their failure to investigate and disclose the material facts that were either misrepresented or not disclosed to Plaintiffs as enumerated above.

218.   Cooper and the Total Wealth Defendants breached their duty to Plaintiffs by making the misrepresentations enumerated above.

219.   Cooper and the Total Wealth Defendants breached their duty to Plaintiffs by failing to disclose the material facts enumerated above.

220.   Plaintiffs were entitled to rely, and did rely, on the representations of Cooper and the Total Wealth Defendants because these defendants were: (1) general partners of

the Altus Fund limited partnership; (2) agents who represented Plaintiffs in securities transactions and who enjoyed discretionary authority over Plaintiffs' investment funds.

221.   Cooper and the Total Wealth Defendants abused the confidence and trust reposed in them by Plaintiffs to gain an unfair advantage at the expense of Plaintiffs.

222.   Due to Cooper and the Total Wealth Defendants' constructive fraud, Plaintiffs have a right to rescind the Altus Fund Limited Partnership Agreement and Subscription Agreement under California Civil Code section 1689, and seek rescission by this action.

223.   Accordingly, the principal amount of Plaintiffs' investment should be refunded to them, with interest thereon, less the amount of any income received thereon.

## FIFTEENTH CAUSE OF ACTION

**(Action on Aegis Retail Notes – Against Aegis Retail, Aegis Holding, and Goggin)**

224.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

225.   Aegis has failed to make the payments due under the Aegis Retail notes and is, therefore, in breach thereof.

226.   Since said breach, despite multiple demands by Plaintiffs, Aegis Retail and the Aegis Alter Egos have failed to return to Plaintiffs the principal balance and/or accrued interest and fees on the Aegis Retail Notes, which failure and refusal was and is a material breach thereof.

227.   As a direct and proximate result of the material breach of the Aegis Retail Notes, Plaintiff has been damaged in the amount to be determined at trial plus interest and fees thereon in an amount to be determined at trial trial.

228.   The Aegis Alter Egos are alter egos of Aegis Holding and are thereof responsible for Aegis Retail's obligations to Plaintiffs as alleged in this Complaint.

229.   The Aegis Retail Notes provide that "[i]n the event suit is brought to enforce payment of this Note, [Aegis Retail] promises to pay reasonable attorneys' fees to be fixed

by the court." Plaintiffs have been required to retain counsel to prosecute the present action on their behalf and are entitled to recover his reasonable attorney's fees and costs incurred herein.

## SIXTEENTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty

### (Against Cooper and the Total Wealth Defendants)

230.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

231.   By virtue of their relationship with Altus Fund and Plaintiffs, Cooper and the Total Wealth Defendants owed Plaintiffs statutory and common law fiduciary duties, including, but not limited to:

      a.      the duty to act with utmost good faith and loyalty toward Plaintiffs;

      b.      duties of trust and confidence;

      c.      the duty to refrain from self-dealing;

      d.      the duty to disclose pertinent business information to Plaintiffs;

      e.      the duty to refrain from exploiting or usurping information or opportunities for their own benefit and to the benefit of others and to the detriment of Plaintiffs;

      f.      the duty to provide and allow verification of receipt and expenditure of funds received from business operations;

      g.      the duty to render true and full information of all things affecting the business operations;

      h.      the duty to account to Plaintiffs;

      i.      the duty to hold as fiduciary for the limited partnership all proceeds;

      j.      the duty to provide a formal accounting as to the affairs of the business.

232.   The Total Wealth Defendants and Cooper breached these duties by the aforementioned acts, including but not limited to: violating their disclosure obligations; failing to account for the business revenue and expenditures; failing to provide detailed accounting of the business activities; and otherwise mismanaging the business affairs contrary to the best interests of the Plaintiffs.

233.   On information and belief, Plaintiffs further allege that the Total Wealth Defendants and Cooper breached these duties by, among other things: making and/or undertaking excessive, inappropriate and unauthorized payments and/or obligations; failing to refrain from self-dealing; usurping limited partnership investment opportunities; and converting limited partnership and/or limited partner assets.

234.   By virtue of their conduct described above, the Total Wealth Defendants and Cooper breached their fiduciary duties owed to Plaintiffs;

235.   As a direct and proximate result of the conduct of the Total Wealth Defendants and Cooper, Plaintiffs have sustained injury. The full extent of Plaintiffs' damages is currently unknown and peculiarly within the knowledge of the Total Wealth Defendants and Cooper. Moreover, some injuries suffered by Plaintiffs are not economic in nature, and thus, Plaintiffs have no adequate remedy at law for such harm.

236.   Accordingly, Plaintiffs are entitled to an award of damages according to proof at trial and the Court should issue an injunction requiring the Total Wealth Defendants and Cooper to comply with their fiduciary duties to disclose and account for Altus Fund's business operations and enjoining them from engaging in further violations of their fiduciary duties.

## SEVENTEENTH CLAIM FOR RELIEF

### Accounting

### (Against Altus Fund)

237.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

238.   As alleged above, Plaintiffs deposited certain funds with Altus Fund to be invested in accordance with recommendations made by Cooper and the Total Wealth Defendants.

239.   On information and belief Plaintiffs allege that Altus Fund used the funds deposited with it to buy and sell securities for its own gain and secret profit, resulting in a decrease of Plaintiffs' capital and money.

240.   The amount of their losses and Altus Fund's secret profits are unknown to Plaintiffs, and cannot be ascertained without an accounting, the means of which are within Altus Fund's knowledge. Plaintiffs have no adequate remedy at law under the circumstances.

241.   Accordingly, Altus Fund should be made to account to Plaintiffs.

## EIGHTEENTH CLAIM FOR RELIEF

### Common Count - Money Had and Received

### (Against Altus Fund, Aegis Retail, and PPCN)

242.   Plaintiffs refer to and incorporate, as though fully set forth herein, each of the foregoing paragraphs, inclusive.

243.   Altus Fund, Aegis Retail, and PPCN took money entrusted to it by Plaintiffs for the subject transactions which, in equity and good conscience, should be returned. Plaintiffs have demanded the return of the money, but Altus Fund, Aegis Retail, and PPCN have refused.

244.   The acts and omissions of Altus Fund, Aegis Retail, and PPCN constitute the wrongful taking of Plaintiffs' money, which in equity and good conscience should be returned.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

a.    For rescission of the various purchases and transactions at issue and recovery of investment capital and fees as the consideration paid for the securities and investment advisory services at issue, less income received;

b.    Where appropriate, for actual damages incurred, to be proven at trial;

c.    For prejudgment interest at the maximum legal rate from the date of purchase and transfer of the consideration;

d.    For costs of suit herein incurred;

e.    Where appropriate, for recovery of attorneys' fees;

f.    For an accounting between Plaintiffs and Altus Fund; and

g.    For such other relief as the Court may deem proper.

Respectfully submitted,

Dated:  December 17, 2013

**SILVER & SILVER APC**

By: ___/s/ Levi Y. Silver_____
Levi Y. Silver

*Counsel for Plaintiffs*

COMPLAINT AND JURY DEMAND